### ACT, INC.

v.

### SYLVAN LEARNING SYSTEMS, INC.

#### No. C96–0334 MJM.

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Dec. 30, 1999.

---

Patrick M. Roby, Elderkin Law Firm, Cedar Rapids, IA, Robert A. Burgoyne, David S. Cohen, Stephen M. McNabb, and Anthony E. DiResta, Fulbright & Jaworski, Washington, D.C., for plaintiff.

Stephen J. Holtman, Simmons, Perrine, Albright & Ellwood, Cedar Rapids, IA, Michael F. Brockmeyer and Francis B. Burch, Jr., Piper, Marbury, Rudnick & Wolfe, Baltimore, Md., David H. Bamberger, Piper, Marbury, Rudnick & Wolfe, Washington, D.C., for defendant.

## ORDER

MELLOY, Chief Judge.

This matter comes before the court pursuant to defendant's July 15, 1999 motion for summary judgment (docket number 101). The plaintiff resisted defendant's motion for summary judgment on August 17, 1999 (docket number 115). Defendant filed a reply to plaintiff's resistance on September 7, 1999 (docket number 126). Oral argument was heard concerning this motion on September 27, 1999. For the reasons set forth below, defendant's mo-

tion for summary judgment is granted in part and denied in part.

Count I of plaintiff's (ACT's) complaint alleges that the defendant (Sylvan) tortiously interfered with ACT's contractual relations with NASD. Count II alleges that Sylvan tortiously interfered with ACT's prospective business advantage with NASD. Count III alleges that Sylvan tortiously interfered with ACT's current and prospective contractual relations with Regents College.[1] Court IV alleges that Sylvan has monopolized the relevant market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2 (1998). Count V alleges that Sylvan has attempted to monopolize the relevant market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. Sylvan claims that it is entitled to summary judgment on all counts.

### Summary Judgment

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P.* 56(c); *Kegel v. Runnels*, 793 F.2d 924, 926 (8th Cir.1986). "Summary judgment is appropriate when there is no genuine issue of material fact and, accordingly, no reasonable jury could find in favor of the nonmoving party." *Hennessey v. Good Earth Tools, Inc.*, 126 F.3d 1107, 1108 (8th Cir. 1997). Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which [it] will bear the burden of proof at trial, there are genuine issues of material fact." *Noll v. Petrovsky*, 828 F.2d 461, 462

(8th Cir.1987), *cert. denied*, 484 U.S. 1014, 108 S.Ct. 718, 98 L.Ed.2d 668 (1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986) (quoting *Impro Prod., Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)). Moreover, no heightened standards for summary judgment apply in antitrust cases. *Midwest Radio Co., Inc. v. Forum Publ'g Co.*, 942 F.2d 1294, 1296 (8th Cir.1991).

█ Nonetheless, the Supreme Court's instructions regarding the granting of summary judgment in antitrust cases remain intact.

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'

*Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 471, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

### Statement of Material Facts
### Not in Dispute

ACT and Sylvan are both in the business of administering standardized tests,

---

1. ACT does not oppose summary judgment on Count III. Summary judgment is therefore granted with respect to Count III.

millions of which are administered every year. Traditionally, standardized tests were given in a paper-and-pencil format. Recently, however, a market in computer-based testing (CBT) has developed and expanded. In the early 1990's, ACT decided that it wanted to enter the CBT market by gaining access to an already established nationwide CBT delivery network.

As of 1994, the National Association of Securities Dealers, Inc. (NASD), an early entrant into the CBT market, operated approximately 55 CBT facilities. In August of 1993, ACT and NASD entered into a Memorandum of Understanding (MOU), under which NASD agreed to provide CBT services at its facilities for ACT and ACT's clients. ACT agreed to market "ACT/NASD–provided computer administered testing services" to third parties. ACT and NASD worked together to market their alliance to the public. The MOU was non-exclusive and contained no provision for ACT to acquire NASD test centers or for ACT to provide test delivery services for NASD.

In May, 1995, NASD and ACT entered into an Interim Test Services Agreement, which did provide for ACT to administer NASD's examinations at ACT's Vernon Hills test center and two other ACT test centers to be opened in Sacramento, CA and New York City. The Interim Agreement noted that ACT and NASD were currently negotiating an agreement to jointly deliver computer-based testing and training. In the event that such an agreement was never executed, the Interim Agreement provided that NASD would assume any real estate leases obtained by ACT or compensate ACT for termination costs. The Interim Agreement did not mention that ACT would acquire NASD's testing network, and it did not provide for the long-term delivery of NASD's tests through an ACT network.

In late November, 1995, ACT and NASD began negotiating a long-term agreement under which NASD would transfer its testing centers to ACT and ACT would provide CBT delivery services to NASD. NASD told ACT that any agreement would need to be presented to and approved by the NASD Board of Governors.

On November 30, 1995, after initially being contacted by Sylvan co-CEO Douglas Becker about the possibility of Sylvan and NASD doing business together, Joseph Hardiman, President and CEO of NASD wrote to Becker, informing him that Sylvan would be afforded an opportunity to compete for NASD's business. On December 19, 1995, Sylvan presented a very favorable proposal to NASD. At this time, Sylvan was aware that ACT and NASD had done business together. On December 22, 1995, O'Donnell (NASD) informed Ferguson (ACT) that Sylvan had submitted a competing proposal. O'Donnell also informed Richard Ferguson that ACT could submit a "best and final proposal." Ferguson told his staff to do no hiring or make further commitments until ACT had a signed agreement with NASD. ACT submitted a "best and final offer" to NASD on January 15, 1996.

On January 18, 1996, the NASD Finance Committee recommended to the NASD Board of Governors that the Sylvan proposal be accepted. ACT was informed of this fact on January 18, 1996. On January 22, 1996 the Board of Governors accepted the Finance Committee's recommendation and approved the selection of Sylvan. NASD and Sylvan executed a letter of intent on January 22 and 23, 1996. The agreement between NASD and Sylvan contains no exclusivity provision. NASD and ACT then negotiated an Unwind Agreement, under which ACT would be compensated for losses sustained by virtue of the fact that ACT and NASD would no longer be doing business together. The Unwind Agreement also provided testing hours in NASD's testing centers for ACT's use through the first quarter of the year 2001.

Since 1993, Sylvan has maintained a 95–100% share of the relevant market in CBT. The relevant product at issue is high secu-

rity CBT. The relevant geographic market is the United States.

Additional undisputed facts and a discussion of the disputed facts will be set forth in connection with the court's analysis of each of ACT's claims.

### Count I–Tortious Interference with Contractual Relations

Count I of ACT's complaint alleges that Sylvan tortiously interfered with ACT's contractual relations with NASD. Sylvan claims that it is entitled to summary judgment on this count because no contract existed between ACT and NASD with which Sylvan could tortiously interfere. Alternatively, Sylvan contends that it is entitled to summary judgment on Count 1 because the undisputed facts show that it had no knowledge of any contractual relationship between ACT and NASD. ACT argues that summary judgment is not appropriate because there is a genuine issue of material fact as to whether ACT and NASD had in place an existing contract. Moreover, ACT claims that a genuine issue of material fact exists as to whether Sylvan knew or had reason to know of the contracts between ACT and NASD.

■■■■ Under Iowa law, it is a tort to intentionally and improperly interfere with the performance of a contract between another and a third person. *Financial Marketing Servs., Inc. v. Hawkeye Bank & Trust of Des Moines*, 588 N.W.2d 450, 458 (Iowa 1999). To prevail under this theory, the plaintiff must prove the following elements:

1. The plaintiff had a valid contract.
2. The defendant knew of the contract.
3. The defendant intentionally and improperly interfered with the contract.
4. The interference caused the contracting parties not to perform the contract with the plaintiff.
5. The amount of plaintiff's damages.

*Corcoran v. Land O'Lakes, Inc.*, 39 F.Supp.2d 1139, 1150 (N.D.Iowa 1999) (citing Iowa Civil Jury Instruction 1200.1). *See also Edward Vantine Studios, Inc. v. Fraternal Composite Serv., Inc.*, 373 N.W.2d 512, 514 (Iowa Ct.App.1985) (listing elements); *RTL Distributing, Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa Ct.App.1996) (same). Absent a valid contract, there can be no claim for tortious interference. *Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276, 287 (Iowa 1998); *Peterson v. First Nat'l Bank of Iowa*, 392 N.W.2d 158, 166 (Iowa Ct. App.1986). Moreover, to succeed on this claim, the plaintiff must prove that the defendant's conduct in intentionally interfering with the contract is improper. *Financial Marketing Servs., Inc.*, 588 N.W.2d at 458. In determining whether defendant's conduct was improper, the following factors may be considered:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other.

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties

*Id.* (citations omitted). The focus of this analysis is "whether the actor's conduct was fair and reasonable under the circumstances." *Id.*

Sylvan argues that it is entitled to summary judgment on this count because there existed no valid contract between ACT and NASD with which Sylvan could tortiously interfere. Sylvan emphasizes that it was clearly understood by all involved that approval by NASD's Board of Governors was required before NASD would be bound. *See Magnusson Agency v. Public Entity Nat'l Company–Midwest*, 560 N.W.2d 20, 26 (Iowa 1997) ("All contracts must contain mutual assent ... A binding contract also requires acceptance of the offer."); *Employee Benefits Plus, Inc. v. Des Moines General Hosp.*, 535 N.W.2d 149, 154 (Iowa Ct.App.1995) (de-

fining "condition precedent" as "those facts and events, occurring subsequent to the making of a valid contract ..."). ACT claims that there were three contracts in place between ACT and NASD (the Memorandum of Understanding dated 8/20/93, the Interim Agreement entered into on 5/10/95, and the Eight–Year Agreement), and that Sylvan tortiously interfered with all of them. ACT further contends that there exists a genuine question of fact whether board approval was a condition precedent to the formation of a contract, or a condition precedent to NASD's obligation to perform.

■ Sylvan is entitled to summary judgment on Count I. Even assuming that the MOU and the Interim Agreement were valid contracts between NASD and ACT, ACT has generated no issue of genuine fact on the second element of their claim, namely that Sylvan knew of these contracts. At best, ACT has demonstrated that Sylvan was aware of some kind of ongoing business relationship between ACT and NASD, which included various joint marketing activities. It is undisputed that, while Sylvan may have been courting NASD to go into business with them over the years, it was NASD who requested that Sylvan submit a bid to compete with ACT's. That NASD solicited a bid would obviously would not give Sylvan reason to think that a valid contract currently existed between ACT and NASD. In addition, the fact that ACT's relationship with NASD was discussed in ACT's annual report, and was discussed at the opening of ACT's testing center in Vernon Hills establishes nothing in light of the fact that there is no evidence that Sylvan read ACT's annual report or was present in Vernon Hills when it was discussed. Moreover, the other conversations and statements purporting to establish Sylvan's knowledge of the MOU and Interim Agreement occurred after NASD encouraged Sylvan to submit a competing proposal, after Sylvan's bid had been accepted, and occurred while Sylvan and NASD were in final negotiations on the long-term deal.

■ With regard to the Eight–Year Agreement, the court agrees with Sylvan that, as a matter of law, there can be no tortious interference with a contract because there was no contract. The record in this case is replete with references to the fact that board approval was a requisite to any finalized deal, and admissions to this exact fact by ACT representatives. For example, ACT Vice–President and Treasurer Joseph Pugh gave the following deposition testimony:

Q: And my question to you, Mr. Pugh, is I take it it was also your understanding that anything–any potential agreement that was entered into between NASD and ACT had to receive final board approval by the NASD?

A: I think they consistently told us that all the way along. So that was always my assumption.

Q: That nothing was final on their end until it had been presented to and approved by the board; is that fair?

A: That was my understanding.

Pugh Depo. at p. 106.

Along those same lines, ACT Vice–President Dr. Ricki Saylor testified as follows:

Q: Dr. Saylor, you knew that whatever understanding was reached by the staff of the NASD and the staff of the ACT that it was going to have to be blessed by NASD's board of directors, didn't you?

A: Yes.

Q: In fact, that was something that was discussed on a number of occasions with the people from NASD that you were working with?

A: Yes.

Saylor Depo. at p. 23.

ACT President, Richard Ferguson also testified to the same effect:

Q: Putting aside how easy or difficult you expected it would be, you knew that it was subject to approval of the board?

A: I knew that it was subject to approval of the board.

Ferguson Depo. at p. 188.

Summaries of negotiation meetings between ACT and NASD in the summer of 1995 confirm that ACT understood board approval to be a requisite to any deal.

> The model selected must be "saleable" within both organizations.... Since implementation of the single model implies a move to customer status NASD will have to be certain its board is convinced. When we raised this issue, NASD indicated they would like to present the deal to the board no later than November. They would, at a minimum, submit a letter of intent to the board with a broad outline of the plan and obtain a commitment to proceed.

Ex. 338 at 108276.

> However, the political challenges within the NASD must be addressed, as well as the financial package which must be sold to the NASD board.... NASD is most concerned about selling their board on the acquisition package, as a whole.... NASD is asking for a unique channel of communication in place of the traditional client/vendor relationship because they believe it will help convince the board to accept the deal.... NASD is prepared to quietly begin selling the idea to individual committee and board members.... They are anxious to have a price proposal from ACT so that we can negotiate a package deal for them to present to the board.

Ex. 339 at 108431, 108432, 108433.

Internal memos from Saylor to Pugh and Ferguson also make it clear that ACT understood that a deal with NASD was contingent upon board approval.

> BOB and NASD lawyers Derek Linden and Joe Fickett have a meeting scheduled on Sept. 7 to begin working on both the letter of intent for the NASD board, as well as the overall agreement.

Ex. 281.

> You'll notice a decided marketing spin on the letter. [referring to a draft cover letter to accompany ACT's revised pro-

posal] I took this approach since Gerry indicated the package would be presented to their membership committee at the end of this month and should emphasize the "non-financial" elements of our deal (in contrast to whatever Sylvan's price might be). So I was writing the letter for this broader audience, to possibly include their board, as well.

Ex. 283.

The "Letter Agreement" from Mr. Ferguson to Mr. James O'Donnell, Executive Vice President of NASD, dated December 4, 1995, is further evidence of this understanding.

> Subject to approval of the terms reflected in this letter by NASD's Board of Directors at its January 1996 meeting, the parties will enter into an agreement (the "Agreement") in January 1996 that implements this letter agreement and supplements the basic terms provided herein.

Ex. 74 at N010169. This letter agreement also requested NASD to sign and return a copy of this "Letter Agreement" if it agreed to the terms. NASD never did this.

In light of these undisputed facts, ACT's argument that there is a genuine question of fact whether board approval was a condition precedent to the **formation** of a contract, or a condition precedent to NASD's **obligation to perform,** lacks any merit. Moreover, ACT's actions during the relevant time period were inapposite to its present contention that the "Eight Year Agreement" was already in place when Sylvan came on the scene. When Jim O'Donnell informed Richard Ferguson that NASD would also be entertaining a proposal from Sylvan, Ferguson did not respond by saying that ACT and NASD already had a contract. Instead, ACT regrouped and submitted a best and final proposal to compete with Sylvan's. *See* Ex. 293 at N–006573. Based upon the foregoing, Sylvan's motion for summary judgment with respect to Count I is granted.

### Count II–Tortious Interference with Prospective Business Advantage

 Unlike tortious interference with contractual relations, the tort of interference with prospective business advantage does not require the existence of a valid contract between the plaintiff and a third party. *Toney v. Casey's Gen. Stores, Inc.*, 372 N.W.2d 220, 222 (Iowa 1985). "Liability under this theory is imposed when a person intentionally and improperly interferes with another's prospective contractual relationships with the sole or primary purpose to injure or destroy the plaintiff." *Financial Marketing Servs., Inc.*, 588 N.W.2d at 459. To succeed on a claim of tortious interference with prospective business advantage, the plaintiff must prove the following elements by a preponderance of the evidence:

1. The plaintiff had a prospective contractual relationship with a third person.
2. The defendant knew of the prospective relationship.
3. The defendant intentionally and improperly interfered with the relationship in one or more particulars.
4. The interference caused either the third party not to enter into or to continue the relationship or that the interference prevented the plaintiff from entering into or continuing the relationship.
5. The amount of damage.

*Tredrea*, 584 N.W.2d at 283. "If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability." *Id.*

 Sylvan argues that it is entitled to summary judgment on this count because the undisputed evidence establishes that Sylvan did not act with the predominant purpose to financially injure or destroy ACT. ACT counters that there is substantial evidence in the record that Sylvan's predominant purpose in bidding for the NASD test centers and test volume was to financially injure or destroy ACT. Specifically, ACT points to a statement made by Sylvan co-CEO Douglas Becker that its proposal would "blow the doors off" of

ACT's. ACT also claims that Sylvan's decision to bid the NASD proposal below cost and lose money on the deal was fueled by a desire to financially injure ACT. Finally, ACT contends that Sylvan's justifications for pursuing an agreement with NASD were pretext.

According to ACT's interpretation of Chris Hoehn–Saric's (Sylvan co-CEO) deposition (pp. 353–356), Sylvan was aware of the fact that ACT was a potential competitor, and Sylvan put itself in ACT's shoes in an effort to figure out how to submit a winning proposal. ACT claims that Hoehn–Saric's testimony demonstrates that Sylvan's predominant purpose in structuring its NASD proposal was to ensure that it won the bid over ACT, thereby eliminating ACT as a competitor. However, even assuming ACT's interpretation as correct, Hoehn–Saric's testimony establishes only that Sylvan sought to submit a proposal to NASD that would beat ACT's proposal. The fact that Sylvan attempted to and did obtain a deal with NASD over ACT does not translate into Sylvan wanting to financially injure or destroy ACT. The same goes for Becker's statement about Sylvan submitting a proposal that would "blow the doors off" of any other. *See Financial Marketing Servs., Inc.*, 588 N.W.2d at 459 (Iowa 1999) (noting that under the theory of interference with prospective business advantage, there is nothing improper about a company acting with the motive to improve its own financial position).

As further evidence of Sylvan acting with a predominant purpose to financially injure or destroy ACT, ACT points to the "internal Sylvan document" which, according to ACT, leaves no doubt regarding Sylvan's intent. To the contrary, the court finds that this document sheds little, if any, credible light on Sylvan's motive whatsoever. The record indicates that this document was written in 1997 by Michelle Ford, a business student doing a summer internship with Sylvan, and edited by Nicholas W. Kouwenhoven, who testified

that he could not vouch for the accuracy of the document, as he did not participate in any of the interviews and its contents were beyond the scope of his expertise. After the conclusion of her internship, Ford was never again employed by Sylvan. At the time the report was written, Kouwenhoven had been employed at Sylvan for a little over a year. Neither Kouwenhoven nor Ford had any personal knowledge of the NASD/Sylvan transaction, nor did those Sylvan employees interviewed by Ford, whose comments and opinions she synthesized to create this document. Moreover, there is no evidence that any of the Sylvan employees interviewed played any part in negotiating the NASD deal, or had any first-hand knowledge thereof. Finally, Ford herself testified that much of the language relied upon by ACT to demonstrate Sylvan's "loathing" of competition and of the prospect of ACT being a competitor, were her own conclusions and interpretations.

An excerpt from Ford's deposition is particularly illustrative on this issue:

Loathes is, in fact, a very strong word, but I didn't intend the document to stand up to legal or academic scrutiny. Again, it's intended to be as pleasant and easy a read as it possibly can be, given the subject matter, with a little bit of spice here and there is what was intended, no more, no less.

Ford depo. at p. 227. For these reasons, Ford's report and the statements contained therein will be given little, if any weight in the court's decision on any issues arising under this motion.

ACT claims that Sylvan's decision to bid its NASD proposal below its own delivery cost makes sense only because it was designed to eliminate competition. Moreover, ACT argues that, given Sylvan's market dominance, it was anti-competitive for Sylvan to attempt to secure NASD's business. As previously noted, there is nothing improper about a company acting with the motive to improve its own financial position. *Financial Marketing Servs., Inc.*, 588 N.W.2d at 459.

Finally, ACT contends that substantial evidence demonstrates that Sylvan's proffered reasons for pursuing the NASD deal were pretext for Sylvan's true motive, which was to financially injure or destroy ACT. The court does not agree. Again, ACT has taken liberties in its attempt to generate a factual dispute. ACT's attempts have failed.

Through the affidavit of Christopher Hoehn–Saric, Sylvan has offered four factors motivating its desire to go into business with NASD. First, at the time the deal was negotiated, Sylvan's domestic CBT network was operating at well below capacity, so Sylvan sought NASD testing volume as a means to fill some of that excess capacity. Second, Sylvan pursued NASD as a client because NASD was a prestigious organization with a well established history in CBT and high visibility in financial markets. Third, NASD itself wanted Sylvan to take over the network so that NASD could remove those assets off of its books. Finally, NASD was a desirable client because many of its centers were located in high-volume urban areas where Sylvan wanted additional coverage.

ACT claims that Sylvan's first proffered motivation (its desire to fill excess domestic capacity) is pretext. In support of this argument, ACT points a letter, written a year and a half prior to submitting the NASD proposal, wherein Sylvan stated that it believed NASD would be an important client because it offered opportunities in overseas financial services. Based on the age of the letter, and the fact that the desire to fill domestic capacity and a desire to explore **overseas** financial opportunities are not inconsistent, the court does not see this as evidence of pretext.

ACT argues that Sylvan's second proffered motivation (desirability of NASD as a client) does not explain why Sylvan's bid included acquisition of NASD test centers. ACT points out that NASD had always been a desirable client, and that Sylvan only aggressively sought to do business with NASD after learning that ACT was in

the picture. Beyond the fact that this assertion does not make sense, ACT's argument raises no genuine issue of material fact and is based solely on conjecture on the part of ACT. This is hardly evidence of pretext.

According to ACT, Sylvan's explanation for offering to purchase NASD's testing centers (NASD wanted Sylvan to), is pretext because, Sylvan could have bid only for NASD's testing volume. According to ACT, Sylvan went after NASD's testing centers only to ensure that ACT did not acquire them. ACT argues as further evidence of pretext that bidding for the testing centers was contrary to Sylvan's business strategy.

In support of its argument, ACT cites a small passage from the December 13, 1995 Sylvan board meeting (exhibit 412 at page S32168) in which Christopher Hoehn–Saric told the board that NASD had told Sylvan of its "discussions with ACT to turn over the NASD testing centers to ACT," not that NASD and ACT were discussing a contract for delivery services. However, instead of being evidence of pretext, the fact that NASD told Sylvan that it was having discussions with ACT regarding the acquisition of testing centers, is a sound explanation for Sylvan's decision to bid for the centers in addition to the volume. Moreover, ACT fails to cite the subsequent sentence from exhibit 412 in which Hoehn–Saric reported to the board that NASD was soliciting a bid from Sylvan to compete with ACT's.

Also in support of its argument, ACT cites to passages from Hoehn–Saric's deposition and Becker's deposition for the proposition that Sylvan was willing to act directly contrary to its business strategy in order to ensure that the testing centers were kept out of ACT's hands. The court has read these passages, and again finds ACT's interpretation of such to be a stretch. Even construing the facts in a light most favorable to the plaintiff, these passages at the most say that Sylvan typically prefers to work through franchise arrangements rather than owning real es-

tate, but that it does, in fact, own some test centers. This is not evidence of pretext.

Finally, ACT claims that Sylvan's fourth motivation for pursing a business relationship with NASD (some NASD test centers were located in high-volume urban areas where Sylvan wanted additional coverage) is pretext because it is contrary to Hoehn–Saric's deposition testimony that Sylvan did not have a particularized need for the test centers, especially in areas where they presently had centers. Again, the court fails to see how these two concepts are contradictory. Although Sylvan may not have had a desire to acquire all of NASD's test centers, some of those located in high-volume urban areas were attractive. Moreover, it is common sense that Sylvan would not have a need for test centers in areas where they already had test centers, especially in light of the fact that Sylvan had some overcapacity issues. The undisputed evidence shows that it was NASD who wished to unload its test centers as part of the deal. Sylvan agreed.

The court finds that ACT has failed to generate a genuine issue of material fact that Sylvan acted with the predominant purpose to financially injure or destroy ACT. Therefore, Sylvan is entitled to summary judgment on Count II.

### Counts IV and V–Monopolization and Attempted Monopolization

Count IV of ACT's complaint alleges that Sylvan monopolized the high-security CBT market in the United States, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. In support of this claim, ACT alleges that Sylvan acquired competitors or potential competitors, used exclusionary, long-term contracts to foreclose entry into the market by others, and engaged in supracompetitive pricing.

Sylvan claims that it is entitled to summary judgment Count 4 because the undisputed facts indicate that Sylvan does not have monopoly power over this market, and there's no dangerous probability that

it will achieve monopoly power in the relevant market. Moreover, Sylvan argues that valid business reasons exist to support its alleged anticompetitive conduct, thereby foreclosing a § 2 claim, and that Sylvan has erected no artificial barriers to entry into this market. To the contrary, Sylvan emphasizes that the market for high-security CBT is expanding with low entry barriers.

Count V of ACT's complaint alleges that Sylvan has engaged in a pattern of anticompetitive acts with the specific intent to attempt to monopolize the high-security CBT market in the United States. To the extent that Sylvan has not already done so, ACT alleges that there exists a dangerous probability that Sylvan will succeed in acquiring monopoly power in the relevant market. Sylvan claims that it is entitled to summary judgment on this count because there is no genuine dispute that there exists no dangerous probability that it will acquire monopoly power.

It is an offense of § 2 of the Sherman Act for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. Section 2 forbids both monopolization and attempted monopolization.

 "Two basic elements must exist to establish a case under section 2 of the Sherman Act: possession of monopoly power in the relevant market[2] and the willful acquisition or maintenance of that power." *Midwest Radio Co. v. Forum Publishing Co.*, 942 F.2d 1294, 1297 (8th Cir. 1991) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). "The second element is distinct from business growth as a consequence of superior product, business acumen or historic accident." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir.1998). *See also Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. 1698.

To prevail on an attempted monopolization claim, "a plaintiff must prove that the defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

 Monopoly power is defined as "the power to control prices or exclude competition." *Tops Markets, Inc.*, 142 F.3d at 98 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). Monopoly power can be proven either by direct evidence of the exclusion of competition, or it may be inferred from one company having a large percentage share of the relevant market. *Id.; Morgenstern, M.D. v. Wilson, M.D.*, 29 F.3d 1291, 1296 (8th Cir.1994), *cert denied*, 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995).

### Direct Evidence

 In 1992–93, Sylvan and Drake competed to become ETS's provider of CBT delivery and administration. Sylvan won the ETS contract. Approximately two years later, in 1995, Sylvan acquired Drake. At the time of the acquisition, Drake was the nation's largest supplier of lower security (IT) testing, and, according to ACT's expert economist, had the potential to expand into high security testing. A few months later, Sylvan began pursuing and eventually did acquire another competitor, the NASD computer testing network. In 1997 Cogent and Sylvan competed to deliver tests for the Board of Certification for Emergency Nursing. Cogent won the contract. Later in 1997, ETS, through its for profit subsidiary Chauncey, and subsequently Sylvan acquired Cogent.

As direct evidence of Sylvan's power to exclude competition, ACT points to com-

---

**2.** The parties have agreed that the relevant market in this case consists of high-security CBT in the United States. *See Midwest Radio*

*Co.*, 942 F.2d at 1297 ("the relevant market to the case must be defined in geographic and product terms").

ments made by people in the industry that after Sylvan acquired Drake and signed an exclusive contract with ETS and The Chauncey Group,[3] Sylvan was the "only game in town." Exhibit 266 at S28335 is an internal Sylvan e-mail dated October 8, 1997, authored by Anthony Scicchitano of Sylvan regarding the National Association of Purchasing Managers (NAPM) renewal agreement. In recommending how Sylvan should proceed, Scicchitano made the following statement: "The only other solution is to force his hand. We are the only game in town right now...." ACT also points to Exhibit 155 at W–M 02203, a memo dated April 8, 1996, written by Bill McConarty of Sylvan to Christopher Hoehn–Saric (Sylvan co-CEO) regarding Regents College of New York and the administration of its exams. In this memo, McConarty stated as follows: "With Sylvan's acquisition of Drake, and the contractual agreement with NASD, the Regents College has come to realize that a competitive procurement for CBT services is not possible."

There were other instances in which Sylvan representatives, namely co-CEO Hoehn–Saric made statements which indicate that not only was Sylvan aware that it had no real competition in the high-stakes, but was proud of it. A letter/proposal from The Chauncey Group, signed by Hoehn–Saric, dated April 23, 1996 to the National Council of State Boards of Nursing, Inc., regarding its NCLEX exam, contains the following statements:

Remarkably, while computer-based testing has seen incredible growth over the past three years, no other organization has been able to reproduce what we have been able to accomplish. NCLEX remains the largest and most successful computer-based licensing program in the world and the Chauncey/ETS/Sylvan partnership remains the only organization that has been able to create the national operational, technical, and psychometric infrastructure for large-scale computer delivery and assessment....

NCLEX candidates have access to the only national state-of-the-art computer network.

Exhibit 428 at CG.012514.

Moreover, Hoehn–Saric testified as follows in a deposition taken on July 12, 1996:

Q: Does Sylvan have any competitors in the market segment regarding high stakes standardized tests?

A: There are many people who are looking at that area. Currently, we are fortunate not to have any really direct competitors that we see on a regular basis. For specific programs when there is a bid, an ASI or an ITC or other companies that tend to be more verticalized will compete for those program. But in terms of being able to provide service on an international and domestic basis in high stakes exams, we don't find much direct competition.

Exhibit 429 at S 61636 (deposition pages 32–33).

In further support, ACT points to comments made by Sylvan's customers regarding the non-existence of competition in the relevant market. In her deposition, Betty Burns of NCC, reading from a memo she wrote to the NCC Board of Directors, stated as follows: "We can't stay with Sylvan–we can't afford them–and not only monetarily–and the other computer vendors are just not viable at this time." (Burns depo. at 104) Jeffrey Kenney of the National Council of Architectural Registration Board (NCARB), testified in his deposition, regarding an e-mail that he had written in which he made statements to the effect that the only down side of switching to CBT, in light of the fact that Sylvan had acquired Drake and NASD, and had an exclusive contract with ETS (The Chauncey Group), and was the sole bidder for NCARB's testing, would be the cost to the test takers. "NCARB would have preferred to have a more competitive environment in the computerized testing business to help keep the costs of test

---

**3.** The Chauncey Group is a wholly-owned subsidiary of ETS.

administration down, but that is not the current situation."

Finally, ACT argues that Sylvan's power to exclude competition and control prices is evidenced by its dealings with NASD. According to ACT, Sylvan acquired the NASD contract by bidding below cost, provided unacceptable service, and then threatened to reduce service even further unless NASD agreed to a price increase. After doing business with Sylvan for a little over a year, NASD sought out other options. With respect to this, Frank McAuliffe of NASD testified that as of 1997, NASD was:

> very unhappy with the service level and had there been some alternative, we would have taken a very hard look at it. But there was no one else out there that had anything significant enough for us to fall back on and recreating it ourselves didn't seem particularly viable either.

McAuliffe depo. at p. 117. ACT also emphasizes that in 1998, after NASD contacted Cogent Testing Network and began investigating Cogent as an alternative to Sylvan, Sylvan acquired Cogent. McAuliffe depo. at p. 119. Moreover, McAuliffe testified that, subsequent to the acquisition, he learned that Sylvan was aware of the fact that NASD was communicating with Cogent. McAuliffe depo. at pp. 123.

With regard to Betty Burns' (NCC) testimony, Sylvan argues that it was taken out of context, and does support the proposition that there are no alternatives to Sylvan. However, the court has read Burns' testimony, in context, and finds that the only other concrete option discussed by Burns was a return to pencil and paper testing, which is outside the relevant market. Burns does mention companies such as ACT, ASI, AMP, and CAT Global, but makes no judgment as to whether they would be viable competition for Sylvan.

Sylvan also argues that Kenney's testimony was taken out of context, and when read more thoroughly, indicates that there were, in fact, alternatives to Sylvan. For example, Kenney testified that he was surprised that some of the other companies who received RFPs did not bid. While the court agrees with Sylvan's assessment of Kenney's statement, it nonetheless finds it to be illustrative of his opinion as to the competition or lack thereof existing in the high-security CBT market.

Additional evidence of Sylvan's ability to exclude competition is found in a letter written by the president of PES (a competitor of The Chauncey Group) to a subcommittee of the PES Board of Directors, in which he makes the following assessment of Sylvan's behaviors and the resulting elimination of competition:

> Until this year, there were three corporations that had a nationwide distribution of computer test centers, and that made computer-based testing available to testing organizations such as PES and their clients. These companies were Sylvan Learning Centers, Drake Training and Technologies (Drake), and the National Association of Securities Dealers (NASD). All three companies had developed the capacity to offer computer-based tests at locations throughout the U.S., which is a necessity for organizations with national licensure or certification programs.
>
> Beginning late in 1995 and early 1996, Sylvan acquired both Drake and the computer-based testing systems of NASD. Thus, at this time, there is only one company, Sylvan, that offers computer-based testing nationally. Neither PES nor any other testing company or credentialing organization can, at this time, acquire nationwide computer-based testing services except through Sylvan. We believe that this situation, where there is only one provider of nationwide computer-based testing services, constitutes genuine restriction of trade.
>
> This situation was then exacerbated when Sylvan signed a contract with Educational Testing Service (ETS) to be their sole provider of computer-based

testing (see Attachment One). The Sylvan/ETS contract stipulated that, if ETS was bidding on any contract that contained the computer-based testing option, that Sylvan could bid only with ETS. ETS has enforced with contract provision with respect to contracts bid by its wholly-owned for profit subsidiary. The Chauncey Group. Thus, although ETS does not compete directly with PES for contracts in the licensure or certification area, The Chauncey Group does so compete. Thus, it is the intent of the ETS/Chauncey to have sole access to the computer-based testing services offered by Sylvan.

Attachment 3 at PES–00070–00071.

As further evidence of Sylvan's ability to exclude competition, ACT points to a document authored by ETS, which, as outlined above, had an exclusive long-term delivery contract with Sylvan, titled "Working Plan for the Information Systems & Technology Division, 1996–2000." This document contains the following statement:

> With the reduced competition in the testing center industry brought about by SYLVAN's acquisition of Drake and NASD, ETS can no longer count on a competitive environment should the relationship with SYLVAN sour.

Attachment 2 at CG 019201.

The court finds that this statement, the report as a whole, the statements made by Sylvan representatives and customers are indicative of Sylvan's dominance of the relevant market and ability to exclude competition.

### Indirect Evidence

As previously noted, monopoly power can be inferred from one company having a large percentage share of the relevant market. *Tops Markets, Inc.*, 142 F.3d at 98; *Morgenstern*, 29 F.3d at 1296. "While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." *Tops Markets, Inc.*, 142 F.3d at 98 (citing several Supreme Court and Second Circuit cases for the general proposition that the higher the market share, the stronger the inference of monopoly power). An inference of monopoly power will be drawn, however, only after fully considering other relevant market characteristics such as the "strength of the competition, the development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." *Id.* (quoting *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking*, 812 F.2d 786, 792 (2d Cir.1987)).

As indirect evidence of Sylvan's alleged monopoly power and ability to control prices, ACT points out that Sylvan has maintained 95–100% of the relevant market. ACT argues that this large market share alone creates an inference of monopoly power, as well as a genuine issue of fact as to whether there is a dangerous probability that Sylvan will achieve monopoly power.

Sylvan does not dispute ACT's figures, but rather argues that a high market share alone cannot create a genuine issue as to the existence of monopoly power, or a dangerous probability that Sylvan will achieve monopoly power. Sylvan contends that a variety of other factors must be considered, including barriers to entry and probable development of the market. When all factors are considered, Sylvan contends that summary judgment is warranted.

### Market Development–Barriers to Entry

Sylvan claims that there are no legally significant barriers to ACT's entering the high-security CBT market. In support of this claim, Sylvan argues that the high-security CBT market is expanding. Sylvan further emphasizes that ACT's long history as a successful test developer and paper-and-pencil testing organization provides it a pre-existing testing volume to facilitate its entry into the market. Finally, Sylvan stresses that ACT had the financial means to develop its own testing centers, and that there was sufficient available testing volume to support another partici-

pant in the market. According to Sylvan, ACT's delay in entering the market is attributable not to any anticompetitive behavior on Sylvan's part, but rather to ACT's own aversion to risk.

ACT counters with the argument that, while it may have financially been able to develop a nationwide network of testing centers, Sylvan's anticompetitive conduct, as outlined above, resulted in insufficient remaining testing volume to support such an investment. According to ACT, the high-security CBT market is not expanding at the rate suggested by Sylvan, and Sylvan has the capacity to absorb whatever growth there is. Moreover, ACT claims that Sylvan erected artificial barriers to entry into the market through (1) its acquisition of competitors or potential competitors, (2) its use of exclusionary of long-term contracts, and (3) supracompetitive pricing.

According to the report of ACT's expert witness, Robert E. Hall, and the supporting documents contained and referenced therein, Sylvan has several long-term or exclusive contracts with consumers in the high-security CBT business. For example, Sylvan's contract with ETS runs until 2006, as does its contract with NASD. Moreover, Sylvan has a 10-year exclusive contract with Johns Hopkins University, and 5-year exclusive contracts with both Regents College and the American Council on Education. Finally, Sylvan has an exclusive relationship with Chauncey as its CBT delivery firm.

Also according to Hall's report, Sylvan engaged in anticompetitive behavior by acquiring competitors and potential competitors, which served to impede entry into the market and reduce competition. In sup-

port of this claim, Hall outlines the following acquisitions and their dates:

| | |
|---|---|
| 1992–1993 | Drake competed against Sylvan for ETS (Sylvan won). |
| 1995 | Sylvan.acquired Drake [4] |
| 1995 | Sylvan began pursuing NASD (which eliminated both ACT & NASD as competitive threats) |
| 1996 | Sylvan made offer to acquire ASI (attempt to disarm a potential competitor to ETS) |
| 1996 | ITC formed Cogent (competitive threat to Sylvan) |
| 1997 | Cogent won test delivery contract for Emergency Nursing Board Exam over Sylvan |
| 1997 | Sylvan made offer to purchase VUE (IT–potential competitor) |
| 1997 | ETS's for-profit subsidiary, Chauncey, acquired ITC & Cogent |
| 1998 | Sylvan & Chauncey announced joint venture (also has in place an agreement not to compete) |

The elements of a § 2 violation, possession of monopoly power in the relevant market, and the willful acquisition or maintenance thereof, are easily resolved in this motion for summary judgment. While Sylvan claims that legitimate business reasons exist to explain all of its allegedly anticompetitive actions, Sylvan's market share, coupled with its use of long-term or exclusive contracts, its acquisitions of competitors or potential competitors, and its dealings with NASD [5] demonstrate that there exists a question of fact whether Sylvan had the power to control prices or exclude competition and willfully acquired or maintained that power. Moreover, the record demonstrates that there exists a genuine issue of material fact whether Sylvan engaged in anticompetitive conduct with the specific intent to monopolize and whether there was a dangerous probability of Sylvan achieving monopoly power. For these reasons, Sylvan's motion for summary judgment on Counts IV and V are denied.

---

4. Sylvan argues that its acquisition of Drake is not relevant as Drake a participant in the IT (lower security) market, and was therefore not a competitor in the relevant market. ACT claims, however, that Drake had plans on becoming a high-security CBT service and was therefore viewed as a potential competitor, which thereby prompted Sylvan's acquisition of Drake.

5. The record shows that NASD was not particularly pleased with Sylvan's performance. When faced with complaints, Sylvan told NASD that the parties would have to renegotiate the price in order to generate better service from Sylvan. Agents of NASD testified that they were not pleased with this arrangement, but agreed to it because there existed no other options. (McAuliffe depo. at 114–116, 139–146, Ex. 18).

*Damages*

 Sylvan claims that it is entitled to summary judgment on ACT's claim for damages because any award of damages in this case would be too speculative. Sylvan argues that ACT has already been reimbursed by NASD for its out-of-pocket expenditures under the Unwind Agreement. Moreover, Sylvan contends that lost profits·in this case would amount to nothing more than speculative projections for a new business in a new industry.

ACT counters that the Unwind Agreement between it and NASD did not cover lost profits, and that the well established history of ACT's profitability and the profitability of the CBT market would provide a sufficient basis for an award of damages. ACT further states that the testimony of its expert basis would provide a reasonable basis for a damage determination. The court agrees. Sylvan's motion for summary judgment on damages as too speculative is denied.

*Order*

Defendant's motion for summary judgment with respect to Counts I and II is granted. Defendant's motion for summary judgment with respect to Counts IV and V are denied. Defendant's motion for summary judgment with respect to damages is likewise denied.

So ordered.