FINANCIAL MARKETING SERVICES, INC. f/k/a Bradley M. Schuchat and Martin M. Schuchat d/b/a Financial Marketing Services, Appellant,

v.

HAWKEYE BANK & TRUST OF DES MOINES, Hawkeye Bancorporation, Mercantile Bancorporation, Inc. and Merger Sub, Appellees.

No. 96–2002.

Supreme Court of Iowa.

Jan. 21, 1999.

Thomas D. Hanson and Robert B. Hanson of Hanson, Bjork & Russell, L.L.P., Des Moines, for appellant.

Roger T. Stetson, Margaret C. Callahan, and Michael R. Reck of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, and Gerald H. Grask, Des Moines, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, NEUMAN, and TERNUS, JJ.

TERNUS, Justice.

This appeal involves a complex controversy surrounding the termination of a long-term business relationship between two primary entities, plaintiff Financial Marketing Services, Inc. (FMS) and defendant Hawkeye Bank & Trust of Des Moines (Hawkeye). Written contracts between the parties generally provided for the sale of life insurance and annuity products by FMS to bank customers who had been referred to FMS by Hawkeye and its affiliates.

The principal issues raised by FMS in the appeal include (1) whether, by virtue of a 1983 contract between the parties, FMS owned the book of insurance business written on the bank's customers, (2) whether a 1990 agreement between the parties included a covenant not to compete that survived termination of the contract, (3) whether the court should imply a restrictive covenant in the 1990 contract, (4) whether Hawkeye improperly interfered with FMS's contracts with insurance companies, (5) whether Hawkeye improperly interfered with FMS's prospective business relationships with insurance customers, and (6) whether Hawkeye was unjustly enriched by the insurance business it solicited upon termination of the parties' relationship. We think the district court properly resolved these issues in Hawkeye's favor as a matter of law. As a consequence, the court did not err in granting summary judgment to the bank on FMS's claims for declaratory and injunctive relief and for tortious interference, and in directing a verdict on FMS's unjust enrichment claim.

Early in the course of this litigation, the trial court granted a temporary injunction preventing Hawkeye from selling life insurance or annuity products to current customers of the parties. FMS was required to post a bond. Upon resolution of the claims made by FMS, the trial court granted, over the bank's objection, FMS's motion exonerating it and its surety from any liability on the bond. Hawkeye filed a cross-appeal challenging this ruling. We conclude the court erred in releasing FMS and its surety from liability on the bond without first affording Hawkeye an opportunity to be heard on its claim for damages arising from the temporary injunction. Therefore, we reverse and remand on the cross-appeal.

I. *Background Facts and Proceedings.*

In 1983, Hawkeye, Firstate Lifeco, Inc. (an affiliate of the bank), and FMS[1] entered into an agreement for the sale of life insurance products to customers of Hawkeye-affiliated banks.[2] Under this agreement, Hawkeye,

---

1. In 1983, Bradley M. Schuchat and Martin M. Schuchat formed a partnership with others known as Financial Marketing Services. This entity was the contracting party in the 1983 and 1990 agreements with the Bank. The partnership was later incorporated as Financial Marketing Services, Inc., the plaintiff in this lawsuit. We refer to both entities as FMS.

2. Hawkeye was owned by defendant Hawkeye Bancorporation, a bank holding company that also owned numerous other banks in Iowa. We

Firstate, and Hawkeye-affiliated banks were required to provide leads or referrals to FMS regarding potential purchasers of life insurance products. FMS in turn was obligated to maintain general agency status with acceptable life insurance carriers on behalf of Firstate and to actively solicit the leads provided to it. Firstate agreed to provide office space and staff for the operations of FMS. The agreement also included specific provisions for allocating the commissions received from the sale of life insurance products. The agreement was for a five-year term, renewable in additional five-year increments. It could be terminated by any party upon a one-year written notice.

In the late 1980's, Hawkeye sought to renegotiate the terms of the agreement in lieu of exercising its termination rights. On March 1, 1990, a new agreement was executed between FMS and Hawkeye. (Firstate was not a party to the 1990 contract.) Under this contract, FMS itself became the general agent and the participating banks, rather than Firstate, agreed to have an officer or employee on staff who could be licensed through FMS to sell life insurance and annuities. The Hawkeye banks continued to have the obligation to make referrals to FMS, and FMS had the corresponding obligation to follow up on these leads. As FMS notes in its brief, "little changed operationally with the execution of the 1990 agreement except the compensation of the parties." The 1990 contract was for a one-year term, automatically renewable for one-year periods; it could be terminated by either party upon six-months written notice.

By 1993, Hawkeye and its parent, Hawkeye Bancorporation, began to consider internalizing their life insurance and annuity programs. To this end, Hawkeye Bancorporation formed a broker-dealer, Hawkeye Investor Center, Inc. (HICI), to sell securities, investments, life insurance and annuities. All bank personnel who were licensed

to sell insurance were transferred to the payroll of HICI.

FMS viewed these actions as precursors to an attempt to take over FMS's book of business in the event the 1990 contract was terminated. As a result, FMS filed suit, claiming it had the exclusive and permanent right to transact life insurance and annuity business with existing bank customers who were also insurance clients of FMS. It sought a declaratory judgment to this effect and injunctive relief to prevent Hawkeye from directly or indirectly interfering with FMS's customer relationships. FMS also made claims for breach of contract and for tortious interference with FMS's existing contractual relationships with insurance companies.

Shortly after this lawsuit was filed, Hawkeye gave FMS written notice that it was terminating the 1990 agreement, effective October 21, 1995. Contemporaneously with this notice, Hawkeye notified its customers that its relationship with FMS was to be terminated as of October 21, 1995. Although Hawkeye told its customers that it would be able to service their life insurance and annuity needs after October 1995, it expressly stated that "[f]or the next six months we will continue working with Financial Marketing Services to bring you tax-deferred annuities and life insurance products."

As a result of this letter and other actions by Hawkeye, FMS sought a temporary injunction to enjoin Hawkeye from interfering and competing with FMS with respect to FMS clients who were also bank customers. As noted above, the district court granted temporary injunctive relief pending a decision on the merits of FMS's claims. FMS was required to post a $250,000 bond. FMS also amended its petition to include a claim for unjust enrichment and a claim for tortious interference with prospective business relationships.

Thereafter, the district court granted Hawkeye's motion for summary judgment on

refer to these affiliated banks as the Hawkeye banks or Hawkeye-affiliated banks. In 1995, Hawkeye Bancorporation entered into an agreement with defendant, Mercantile Bancorporation, Inc., under which Hawkeye Bancorporation was merged into an entity known as Merger Sub,

another defendant in this action. Mercantile Bancorporation and Merger Sub did not participate in the events giving rise to this lawsuit and were named as defendants simply for purposes of any assumption of liability arising from the merger transaction.

FMS's request for declaratory and injunctive relief and its tortious interference claims. (Despite the court's summary judgment ruling, the temporary injunction remained in effect.) The contract and unjust enrichment claims proceeded to trial. After the close of evidence, the trial court granted Hawkeye's motion for directed verdict on the unjust enrichment claim. The jury subsequently returned a verdict in the bank's favor on the contract claim.

After final judgment, Hawkeye brought a separate action on the injunction bond. FMS, however, filed a motion in the present case to release it from its obligation to post security and to exonerate it and its surety from any liability on the bond. Over Hawkeye's objections, the trial court granted FMS's motion.

This appeal and cross-appeal challenge the district court's rulings on Hawkeye's motion for summary judgment, Hawkeye's motion for directed verdict, and FMS's motion on the bond. FMS did not appeal from the jury's adverse decision on its contract claim.

## II. Scope of Review—Summary Judgment Ruling.

We review a district court's ruling on a motion for summary judgment for correction of errors of law. See *American Family Mut. Ins. Co. v. Allied Mut. Ins. Co.*, 562 N.W.2d 159, 163 (Iowa 1997). Summary judgment will be upheld when the moving party shows there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See Iowa R. Civ. P. 237(c). Thus, we first determine whether there is any genuine issue of material fact. See *Hoefer v. Wisconsin Educ. Ass'n. Ins. Trust*, 470 N.W.2d 336, 338 (Iowa 1991). If not, the court must decide whether the moving party is entitled to judgment as a matter of law. See *id.*

An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See *Fees v. Mutual Fire & Auto. Ins. Co.*, 490 N.W.2d 55, 57 (Iowa 1992). When the dispute is over facts that might affect the outcome of the suit under the applicable law, the issue is likewise "material." See *Farm & City Ins. Co. v. Anderson*, 509 N.W.2d 487, 491 (Iowa 1993). We consider the entire record before us, including the pleadings, depositions, answers to interrogatories, and admissions on file. See Iowa R. Civ. P. 237(c).

## III. Claim for Declaratory and Injunctive Relief.

FMS claimed in its petition that its contractual relationship with Hawkeye entitled it to a "declaration that in the event of termination of the relationship ... [FMS] has the exclusive and permanent right as between [FMS] and [Hawkeye] to transact life insurance and annuity business with [FMS's] existing insurance clients who are also [Hawkeye] bank customers." It also sought a permanent injunction to prevent Hawkeye from soliciting FMS's clients. In support of this claim, FMS relies primarily on two contractual provisions, one in the 1983 contract and one in the 1990 contract.[3] As a fall back position, FMS argues that even if the 1990 contract did not contain a covenant not to compete, the court should imply such a covenant. We discuss each argument separately.

A. *1983 contract.* FMS contends that paragraph thirteen of the 1983 agreement provides FMS with a perpetual ownership interest in the book of business obtained through its affiliation with the Hawkeye banks. This provision of the 1983 contract vested agent-level renewal commissions in FMS on a graduated scale, with such renewal commissions being fully vested after five years. (No part of any general agent's renewal commission vested under this paragraph.)

---

**3.** Hawkeye claims that the 1990 contract is fully integrated and therefore, the parol evidence rule prevents the court from considering any terms in the 1983 contract. FMS disputes that the 1990 contract is fully integrated. We do not decide this issue because we conclude the 1983 contract, even if considered, does not support FMS's claim for declaratory and injunctive relief. Consequently, any factual dispute concerning whether the 1990 contract is fully integrated is not material and, therefore, does not preclude summary judgment.

We think this provision does nothing more than entitle FMS to the agent-level renewal commissions allocable to it on the business generated while the 1983 contract was in effect.[4] In other words, renewal commissions on any policies written between 1983 and 1990 were vested in FMS pursuant to the schedule contained in paragraph thirteen. There is no basis in this contractual provision for a factual finding that FMS owned the underlying book of business.

We rejected a nearly identical argument in *Burke v. Hawkeye National Life Insurance Co.*, 474 N.W.2d 110, 111–13 (Iowa 1991). In that case, the defendant insurer was sued by Burke, one of its former independent insurance agents. *Burke*, 474 N.W.2d at 111. Burke claimed the insurance company breached the parties' agency agreement when it solicited his clients. *Id.* at 112. More specifically, Burke claimed that the insurer violated his vesting privileges under the contract when it wrote replacement policies that eliminated his renewal commissions. *Id.* at 113. We rejected this claim, stating:

> The weak link in Burke's contract argument is the lack of any binding agreement between the parties, written or oral, concerning "ownership" of Burke's customers. There appears little dispute that the written contract is silent on the question. Clearly the policyholder information was as accessible to [the insurance company] as to Burke. In the absence of an agreement giving an agent the exclusive right to use such information, we have held both agent and principal are free to solicit insurance business based on customer records contained in their respective files.
>
> ... Evidence of Burke's reliance on industry custom and vague company promises about the "nest egg" he was building simply does not rise to the level of proof necessary to establish an oral contract.

*Id.* (citations omitted).

We think our holding in *Burke* is dispositive of the claim made by FMS here. FMS's entitlement to renewal commissions is simply not the same as ownership of the book of business generating those commissions. Consequently, the vesting provision in the 1983 contract cannot, as a matter of law, support a declaratory judgment that FMS has the exclusive right to conduct insurance business with the clients referred to it by Hawkeye.

■ B. *1990 contract.* FMS argues that the 1990 contract contained a provision that, when considered with FMS's vesting rights under the 1983 agreement, provided FMS with "permanent protection ... from Hawkeye for life insurance and/or annuity business generated by or through the efforts of FMS." FMS relies on the following language from the 1990 contract: "[Hawkeye] agrees ... to not compete with FMS or deal with any other third party with respect to the sale of insurance policies and annuities *covered by this Agreement....*" (Emphasis added.) The district court held that this provision was effective only during the life of the contract.

FMS contends the contract does not contain a general restriction against competition, but merely prevents Hawkeye from interfering with existing contracts between FMS and the banks' customers. FMS argues that the following evidence extrinsic to the agreement itself supports this interpretation of the 1990 agreement: (1) the vesting provision in the 1983 contract; (2) the 1983 contract was never formally terminated; (3) the 1990 contract did not address the subject of vesting of renewal premiums; (4) FMS became the general agent under the 1990 contract; and (5) FMS's continued development of the insurance business of bank customers.

■ "[E]xtrinsic evidence is admissible as an aid to *interpretation* [of a contract] when it throws light on the situation of the parties, their antecedent negotiations, the attendant circumstances, and the objects the parties were striving to attain." *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978) (emphasis added).

---

4. The parties dispute whether this provision applied only to life insurance products or also encompassed annuities. We conclude this dispute is not material to a determination of whether the vesting provisions gave FMS ownership of the book of business and, therefore, we do not consider it further.

"Interpretation involves ascertaining *the meaning of contractual words;* construction refers to deciding their legal effect." *Id.* (emphasis added). The flaw in FMS's position is that the evidence it offers does not assist in determining the "meaning of contractual words."

■ The initial issue to be resolved is whether the non-compete provision survives the termination of the contract. The contractual restriction applies only to "the sale of insurance policies and annuities covered by this [the 1990] Agreement." The agreement states that it is in effect from March 1, 1990 until February 28, 1991, subject to one-year renewals unless terminated by either party upon six-months written notice. There is no provision in the contract that sales of policies and annuities occurring before the contract became effective or after its termination are covered by the terms of the contract.

Importantly, FMS does not specifically relate the extrinsic evidence upon which it relies to the interpretation of any *contractual terms* relevant to the issue before us, namely, whether any restrictions on competition extend beyond termination of the 1990 contract. FMS simply alleges that the evidence creates a genuine issue as to whether the 1990 agreement not to compete continues after termination of the contract. We conclude FMS's reliance on extrinsic evidence is in reality an inappropriate attempt to vary the terms of the agreement. *See Bankers Trust Co. v. Woltz,* 326 N.W.2d 274, 276 (Iowa 1982) (holding extrinsic evidence may be used only to interpret, not alter, a written contract).

We think the district court did not err in concluding that the non-compete provision does not apply, by its own terms, to sales made after the contract has terminated. Therefore, the court correctly ruled there was no factual basis in the record to find a perpetual covenant not to compete in the 1990 contract.

■ C. *Implied restrictive covenant.* FMS argues that the court should imply a restrictive covenant in the 1990 agreement. We note that "[a]greements in restraint of trade are generally disfavored." *Lamp v.*

*American Prosthetics, Inc.,* 379 N.W.2d 909, 911 (Iowa 1986). Moreover, a party must meet a high standard to establish an implied covenant:

Courts are slow to find implied covenants. The obligation must arise from the language used or it must be indispensable to give effect to the intent of the parties; it must have been so clearly within their contemplation that they deemed it unnecessary to express it. It can be justified only on the ground of legal necessity and can arise only when it can be assumed it would have been made part of the agreement if attention had been called to it.

*Fashion Fabrics,* 266 N.W.2d at 27–28. FMS contends there is a genuine issue of material fact as to whether it has satisfied this test for an implied covenant.

We have already determined that the language of the contract itself does not provide for a perpetual covenant not to compete, nor do we think that such a covenant arises from the language of the contract. Thus, we are left to consider whether such a covenant is "indispensable to give effect to the intent of the parties." *Id.* at 27. FMS relies upon the following evidence to generate a factual dispute on this issue: (1) under the 1990 agreement, FMS was a general agent that contracted for itself with insurance companies to provide products for its clients; (2) FMS was an independent contractor under the 1990 agreement and had complete control over its operations; (3) the 1990 agreement was a referral arrangement; and (4) FMS was fully vested in all agent-level renewal commissions. FMS apparently contends it was the intent of the parties that FMS would own this book of business and enjoy the renewal commissions generated on this business in perpetuum without any competition from Hawkeye.

This argument fails for reasons similar to those discussed in connection with the 1983 contract claim. Regardless of any vesting rights FMS had under the 1983 contract, the evidence does not support a finding that the parties intended that FMS would own the underlying book of business. Absent evidence of such an intent, FMS must generate a factual issue on whether a covenant not to

compete is indispensable to the intent that *is* expressed in the 1990 contract. Although the 1983 contract vested agent-level renewal commissions in FMS, under the 1990 contract writing-agent renewal commissions were payable to the bank and FMS received the general agent's share of the commission. Our review of the record reveals no evidence from which a fact finder could conclude that a covenant not to compete is a "legal necessity" to effectuate the parties' intent, even if we consider FMS's right to renewal commissions under the 1983 contract. *See Fashion Fabrics*, 266 N.W.2d at 28 (holding covenant must be a "legal necessity"); *see also Burke*, 474 N.W.2d at 113 (holding that insurance company's solicitation of agent's customers did not violate agent's vested right to renewal commissions).

To recognize an implied covenant not to compete under these circumstances would be tantamount to holding that FMS owned the book of business, a right not bestowed by the 1983 contract or the 1990 contract. We conclude, therefore, that the district court did not err in entering summary judgment for the bank on FMS's claim that a covenant not to compete should be implied in the 1990 contract.

### IV. *Tortious Interference With Contract.*

■ The district court also granted summary judgment to Hawkeye on FMS's claim that Hawkeye tortiously interfered with FMS's contractual relationships with insurance and annuity companies. The interference consisted of Hawkeye's alleged efforts to compete with FMS in selling insurance and annuity products to bank customers who were also clients of FMS. We think the district court properly granted summary judgment on this claim because Hawkeye's conduct was not improper as required to recover under this theory of liability.

[11, 12] Iowa law imposes tort liability on a person who intentionally and improperly interferes with the performance of a contract between another and a third person. *See Nesler v. Fisher & Co.*, 452 N.W.2d 191, 194–95 (Iowa 1990). The following factors may be considered in determining whether an actor's conduct in intentionally interfering with a contract is improper:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Toney v. Casey's Gen. Stores, Inc.*, 460 N.W.2d 849, 853 (Iowa 1990) (quoting Restatement (Second) of Torts § 767 (1979)). The basic focus of the analysis is "whether the actor's conduct was fair and reasonable under the circumstances." *Id.* (quoting Restatement (Second) of Torts § 767 cmt. j). With this focus in mind, and after considering the factors listed above, we agree with the district court that Hawkeye's actions were not improper as a matter of law.

As noted earlier, Hawkeye's alleged interference was generally twofold: (1) efforts to position itself to handle the sale of life insurance and annuity products internally; and (2) after termination of the 1990 contract with FMS, direct competition with FMS for the sale of these products to bank customers. We have already discussed that there was nothing in the contractual arrangements between the parties to prohibit such competition upon termination of the contract. Additionally, the jury rejected FMS's claim that Hawkeye had breached the 1990 contract by competing with FMS in the sale of life insurance and annuities prior to termination of that contract.[5] We also note that FMS did

---

5. The jury found that FMS had failed to prove that Hawkeye had breached the contract in any of the following ways:
 a. In failing to refer prospects for life insurance products including annuities to plaintiff or using best efforts to provide such leads, including but not limited to, removing bank licensed employees from the banks, not having licensed employees of banks available to make referrals, in failing to have qualified bank licensed personnel to make referrals.

not introduce any evidence of industry practice or customs that would indicate the bank's actions were unfair or unreasonable. *See* Restatement (Second) of Torts § 767 cmt. j, at 37 (stating that "[r]ecognized standards of business ethics and business customs and practices are pertinent").

FMS specifically complains that Hawkeye used "the FMS customer list and the FMS licensed agents to compete directly for the FMS book of business." There is no evidence that Hawkeye sought a customer list in the possession of FMS. Rather, Hawkeye merely compiled such a list from its own records; after all, FMS's clients were originally bank customers and were referred to FMS by the Hawkeye banks. There is nothing improper about Hawkeye using information in its own files for purposes of soliciting business. *See Burke*, 474 N.W.2d at 113 (citing *Ballagh v. Polk–Warren Mut. Ins. Ass'n*, 257 Iowa 1334, 1343, 136 N.W.2d 496, 501 (1965)); *cf. Lemmon v. Hendrickson*, 559 N.W.2d 278, 280–81 (Iowa 1997) (holding former employee could properly use recollection of customer information where he did not otherwise misappropriate an actual customer list). With respect to Hawkeye's use of "FMS licensed agents," these agents were employees and officers of Hawkeye banks or HICI. Hawkeye certainly had a right to continue to use the services of these employees after termination of their relationship with FMS.

Importantly, there is no evidence that the bank was motivated, in whole or in part, by a desire to interfere with FMS's contractual relations, or otherwise to injure FMS. Such interference, if any, was merely a necessary consequence of Hawkeye's desire to service its customers' insurance and annuity needs in-house.

Hawkeye's actions adversely impacted FMS's economic interests, but such actions were undertaken to advance Hawkeye's own economic interests. As we previously pointed out, society favors competition, so these factors would not support a finding that Hawkeye acted improperly.

With respect to the sixth factor, FMS asserts that Hawkeye's actions made it more difficult to service FMS's insurance clients and maintain the policies in force, as FMS was required to do under its contracts with various insurance carriers. As for the last factor, the record establishes that the parties were independent business entities.

Our examination of these factors does not reveal substantial evidence to support a factual finding that Hawkeye acted improperly as required to recover on a claim of intentional interference with contract. Therefore, the trial court properly granted summary judgment to the bank on this claim.

## V. *Interference With Prospective Business Advantage.*

 FMS also claimed that Hawkeye tortiously interfered with FMS's prospective business relationships with its clients. Liability under this theory is imposed when a person intentionally and improperly interferes with another's prospective contractual relationships with the sole or primary purpose to injure or destroy the plaintiff. *See Willey v. Riley*, 541 N.W.2d 521, 526–27 (Iowa 1995). The record lacks substantial evidence to support a finding that Hawkeye acted with the sole or primary purpose of injuring or destroying FMS.

As previously discussed, the evidence shows that Hawkeye acted to improve its own financial position by servicing its customers' insurance and annuity needs internally. There is nothing improper about this motive. *See Berger v. Cas' Feed Store*, 543

---

b. In failing to allow plaintiff to service its ongoing business with its customers, including, but not limited to, preventing plaintiff from servicing its ongoing insurance business by interfering with its direct sales operations by replacing plaintiff's sales agents with HICI representatives, preventing plaintiff from contacting customers and preventing plaintiff from having access to bank premises.

c. In competing during the term of the contract with plaintiff in the marketing and sales

of life insurance and annuity products to bank customers who are existing clients of FMS and/or interfering with those customers, including but not limited to, allowing others to sell variable annuities and life insurance products, contacting insureds and annuity holders and soliciting their present and future business.

N.W.2d 597, 599–600 (Iowa 1996); *Wilkin Elevator v. Bennett State Bank,* 522 N.W.2d 57, 62 (Iowa 1994). Any harm to FMS was merely incidental to the accomplishment of Hawkeye's primary goal. Consequently, the district court did not err in granting summary judgment to the bank on this claim. *See Willey,* 541 N.W.2d at 528 (citing cases where claims of intentional interference with prospective contract have been dismissed for lack of substantial evidence to support the claim).

### VI. *Unjust Enrichment Claim.*

After the parties had presented their evidence at trial, the district court granted Hawkeye's motion for directed verdict on FMS's claim for unjust enrichment. We review this ruling for correction of errors of law. *See Tomka v. Hoechst Celanese Corp.,* 528 N.W.2d 103, 106 (Iowa 1995). In deciding whether the trial court correctly concluded that there was insufficient evidence to submit the claim to the jury, we view the evidence in the light most favorable to the nonmoving party. *See id.*

FMS's unjust enrichment claim rests upon the doctrine of implied-in-law contracts. Such contracts do not arise from the traditional bargaining process, but rather "rest on a legal fiction arising from considerations of justice and the equitable principles of unjust enrichment." *Hunter v. Union State Bank,* 505 N.W.2d 172, 177 (Iowa 1993). They are quasi-contracts based on the "'rule of law that requires restitution to the plaintiff of something that came into the defendant's hands but belongs to the plaintiff.'" *Id.* (quoting Dan B. Dobbs, *Handbook on the Law of Remedies* § 4.2, at 235 (1973)); *accord Robert's River Rides v. Steamboat Dev. Corp.,* 520 N.W.2d 294, 302 (Iowa 1994). FMS contends that Hawkeye has received value from the book of life insurance and annuity business developed by FMS during their contractual relationship and that FMS should be compensated for this.

We first note that FMS makes no claim that it has not been paid commissions owed to it under the 1983 and 1990 contracts. As for future sales of life insurance and annuity products to bank customers who are also clients of FMS, we have already determined that Hawkeye is not prohibited by contract or by principles of tort law from competing with FMS for this business. Therefore, Hawkeye has not received anything of value that belongs to the plaintiff. Consequently, the district court correctly directed a verdict on this claim.

### VII. *Cross–Appeal—Exoneration of Bond.*

The essence of Hawkeye's argument on its cross-appeal is that the trial court violated its due process rights by releasing FMS and its surety from any liability on the bond without first allowing Hawkeye an opportunity to show that it had sustained damages as a result of the temporary injunction. *See* U.S. Const. amends. V, XIV. In considering such a constitutional claim, "our review is de novo in light of the totality of the circumstances." *Exira Community Sch. Dist. v. State,* 512 N.W.2d 787, 791 (Iowa 1994).

A party who obtains a temporary injunction against another must post a bond. *See* Iowa R. Civ. P. 327. The purpose of the bond is to protect the party who is enjoined from damages resulting from an injunction that proves to have been improperly granted. *See City of Corning v. Iowa–Nebraska Light & Power Co.,* 225 Iowa 1380, 1385, 282 N.W. 791, 794 (1938). Upon dissolution of the injunction, the enjoined party may bring an action against the party who sought the injunction as well as its surety to recover damages. *See Dennis v. Mantle,* 173 Iowa 450, 451, 155 N.W. 830, 830 (1916); *Shenandoah Nat'l Bank v. Read,* 86 Iowa 136, 141–42, 53 N.W. 96, 96 (1892). Also of importance to our analysis is the concept that "[d]ue process mandates that persons who are required to settle disputes through the judicial process 'must be given a meaningful opportunity to be heard.'" *In re Marriage of Seyler,* 559 N.W.2d 7, 9 (Iowa 1997) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 377, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 118 (1971)).

Here, Hawkeye filed a separate action alleging damages as a result of having been prevented from competing with FMS for one

year after the termination of the 1990 contract. This action was brought against FMS and its surety. Notwithstanding the pending action, FMS filed a motion in the present case not only to terminate the requirement that it continue the bond, but also to exonerate the bond and release the surety. At the hearing on FMS's motion, Hawkeye argued that it would be improper to exonerate the bond because to do so would release FMS and its surety from any liability for damages incurred by Hawkeye during the period the bond was in force. At the time of this hearing, Hawkeye's claim against the bond for damages had not yet been heard.

In its ruling on FMS's motion, the district court dissolved the temporary injunction and held that FMS was no longer required to post security. In addition, the court "exonerated" the bond and "released" the surety. It is the latter rulings that Hawkeye claims violate its due process right to a hearing.

The word "exonerate" means "to relieve esp. of a charge, obligation, or hardship." *Webster's Third New Int'l Dictionary* 797 (unabr. ed.1993). The term "release" is defined as "to relieve from something that confines, burdens, or oppresses." *Id.* at 1917. Thus, the effect of the court's ruling was to discharge FMS and its surety from any liability for damages under the bond and to eliminate the bond as a source of funds for the payment of any such damages. Because the court's ruling occurred prior to a decision on whether Hawkeye had sustained damages as a result of the temporary injunction, the protection of the bond was rendered illusory. More importantly, Hawkeye was denied a hearing on whether it had a valid claim under the bond.

Although it was entirely appropriate for the district court to order that FMS had no obligation to continue the bond once the injunction had been dissolved, whether FMS and its surety had any liability to Hawkeye for the period during which the bond was in effect is a different question. A decision on that issue must await a hearing on Hawkeye's pending action to recover damages from FMS and its surety. Thus, the trial court should not have exonerated or released FMS and its surety from any liability to

Hawkeye for damages sustained during the term of the bond.

That part of the court's order exonerating the bond and releasing the surety from liability is reversed. We remand the case to the district court to allow the court to modify its prior ruling on FMS's motion to be consistent with our decision, and for any other appropriate proceedings.

VIII. *Summary.*

FMS is not entitled to declaratory or injunctive relief prohibiting competition from Hawkeye with respect to bank customers who are also clients of FMS. FMS's vesting privileges under the 1983 contract are not equivalent to ownership of the book of business developed while that contract was in effect. Additionally, the 1990 contract between the parties does not provide protection to FMS against competition from Hawkeye upon termination of the agreement, even when the extrinsic evidence offered by FMS is considered. Finally, a covenant not to compete is not essential to effectuate the parties' intent under the 1990 contract, and therefore cannot be implied. For these reasons, the district court properly granted summary judgment to the bank on FMS's claims for declaratory and injunctive relief.

The district court also correctly granted summary judgment to Hawkeye on FMS's claims for tortious interference with existing and prospective contractual relations. There is not substantial evidence in the record to show that Hawkeye acted improperly or that it acted with the sole or predominant purpose to financially injure or destroy FMS. The bank engaged in permissible competition to further its own economic interests, conduct that does not support FMS's intentional interference claims.

We also hold that the district court did not err in directing a verdict for Hawkeye on FMS's claim for unjust enrichment. Because FMS did not own the clients who had been referred by Hawkeye and its affiliated banks, Hawkeye did not obtain anything that rightfully belonged to FMS when Hawkeye solicited these clients. Therefore, there is not

substantial evidence to support a finding of unjust enrichment.

With respect to the district court's post-trial ruling on the bond, we hold that it erred in exonerating the bond and releasing the surety. Hawkeye has a due process right to be heard on its claim for damages prior to a decision on whether the bond should be exonerated and the surety released.

**AFFIRMED ON APPEAL; REVERSED AND REMANDED ON CROSS–APPEAL.**