# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 01-2775
No. 01-3583

———————

| | | |
|---|---|---|
| ACT, Inc., | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Sylvan Learning Systems, Inc., | * | |
| | * | |
| Appellee. | * | |

———————

Submitted: February 12, 2002

Filed: July 11, 2002

———————

Before BOWMAN, RICHARD S. ARNOLD, and WOLLMAN, Circuit Judges.

———————

BOWMAN, Circuit Judge.

This case arises from agreements entered into by Sylvan Learning Systems, Inc., and the National Association of Securities Dealers, Inc. (NASD), concerning the operation and transfer of computer-based testing (CBT) centers owned by NASD. ACT, Inc., contends that its own dealings with NASD before Sylvan came on the scene and Sylvan's behavior in doing business with NASD provide the basis for its claims under Iowa state law for tortious interference with contractual and prospective business relations and for its federal antitrust claim. ACT appeals from the final

judgment of the District Court[1] in favor of Sylvan on all of ACT's claims and from a later order awarding costs to Sylvan. We affirm.

I.

At the time of the events leading up to this lawsuit, ACT was a non-profit corporation providing clients with, among other things, standardized testing for academic and professional purposes. Sylvan was furnishing high-security computer-based testing and other educational services to its customers. In 1993, NASD owned and operated a network of CBT centers providing certification testing to stock brokers. In the early 1990's, ACT became interested in the CBT market and to that end entered into two agreements with NASD.

The first agreement was a Memorandum of Understanding (MOU) executed by both parties in August 1993 stating that ACT and NASD were entering into "a non-exclusive relationship that facilitates mutual development of business opportunities involving computer testing services." 1993 Memorandum of Understanding between American College Testing and National Association of Securities Dealers (hereinafter MOU) at 1, ¶ A.1. The agreement recognizes that ACT wished to provide CBT services to some of its clients and that NASD already was providing such services through the nationwide testing centers it operated. The agreement says nothing about ACT acquiring NASD's testing centers, indicating only that "ACT's corporate plan calls for it to eventually administer computerized testing through its own network of centers," without suggesting how ACT would establish those centers. Id. at 2, ¶ A.4.

---

[1]The Honorable Michael J. Melloy, United States District Judge for the Northern District of Iowa. Judge Melloy has since been appointed United States Circuit Judge for the Eighth Circuit and currently serves in that capacity.

In May 1995, NASD and ACT jointly executed an interim letter agreement (Interim Agreement). The letter's purpose was to "supplement the parties' MOU and govern their relationship" until negotiations "for the joint delivery of computer-based assessment services" resulted in the execution of a "final" agreement. Letter of May 3, 1995, from Gerard F. Foley, NASD senior vice-president, to RickiAnn Saylor, ACT vice-president, Re: Interim Test Assessment Services Agreement (hereinafter Interim Agreement) at 1. The Interim Agreement was to terminate August 1, 1995, unless "ACT continue[d] to provide assessment services to NASD after August 1, 1995, without the parties' having executed the" final agreement. Id. at 3, ¶ 9. In that event, the parties were to continue to be bound by the terms of the Interim Agreement until terminated by written agreement of ACT and NASD. As with the MOU, the agreement was not exclusive, clearly was expected to be short term, and did not involve the transfer of NASD's CBT centers to ACT.

A third proposed agreement between ACT and NASD, which never was executed by NASD, was in the form of a letter dated December 4, 1995, from ACT to NASD. Under the terms of this Proposed Letter Agreement, ACT was to provide "technology-based assessment services" to NASD from January 1996 through December 2003. Letter of Dec. 4, 1995, from Richard L. Ferguson, ACT president, to James P. O'Donnell, NASD executive vice-president, Re: Letter Agreement (hereinafter Proposed Letter Agreement) at 1. Subject to certain conditions, NASD was to "assign all of its testing centers to ACT on January 1, 1998." Id. at 2, ¶ 5. But instead of entering into this agreement with ACT, NASD decided to accept a last-minute offer made by Sylvan. Under the terms of that offer, Sylvan initially would manage NASD's CBT centers and eventually NASD would transfer the centers to Sylvan. The Sylvan-NASD agreements were executed in March 1996.

After closing the deal with Sylvan, NASD reached a settlement with ACT on the termination of the MOU and the Interim Agreement. ACT then sued Sylvan in November 1996. The complaint included allegations in five counts: Count I, Sylvan

tortiously interfered with ACT's contractual relations with NASD; Count II, Sylvan tortiously interfered with ACT's prospective business advantage with NASD; Count III, Sylvan tortiously interfered with ACT's current and prospective contractual relations with Regents College; Count IV, Sylvan monopolized the relevant market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; and Count V, Sylvan attempted to monopolize the relevant market. Sylvan sought summary judgment on all counts; the District Court granted Sylvan's motion on Counts I, II, and III and initially denied judgment on Counts IV and V. After granting Sylvan's motion in limine on the issue of antitrust damages, the court granted Sylvan's renewed motion for summary judgment on Counts IV and V.[2]

## II.

Summary judgment shall be granted on motion of a party if the record shows "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We review de novo, applying that same standard. We consider the record in the light most favorable to ACT and give ACT the benefit of all reasonable inferences that may be drawn from the evidence. See Netland v. Hess & Clark, Inc., 284 F.3d 895, 898 (8th Cir. 2002) (standard of review).

To be successful under Iowa law on its claim for tortious interference with contractual relations, ACT must be able to prove five elements: (1) that it had a contract with NASD; (2) that Sylvan knew of the contract; (3) that Sylvan "intentionally and improperly interfered with the contract"; (4) that the interference caused NASD "not to perform, or made performance more burdensome or expensive"; and (5) that ACT was damaged as a result. Gibson v. ITT Hartford Ins.

---

[2]ACT did not oppose Sylvan's motion for summary judgment on Count III, and that judgment is not before us on appeal.

-4-

Co., 621 N.W.2d 388, 399 (Iowa 2001) (citations to quoted cases omitted). The District Court held that ACT could not prove that Sylvan knew about the MOU and the Interim Agreement. Viewing the evidence in the light most favorable to ACT, the court further determined that the Proposed Letter Agreement did not amount to a contract. On appeal, ACT contends that summary judgment was improper because genuine issues of material fact remain on these issues.

A.

We consider first Sylvan's knowledge of the MOU and the Interim Agreement. As ACT points out, it is not necessary under Iowa law that Sylvan knew of the existence of the specific agreements in order for liability to attach. All that is required is proof of "knowledge of facts which, if followed by reasonable inquiry, would have led to the disclosure of the contractual relationship between" ACT and NASD. Revere Transducers, Inc. v. Deere & Co., 595 N.W.2d 751, 764 (Iowa 1999) (quoting as a correct statement of the law a jury instruction from the case on appeal). But even though only inquiry notice is required, we conclude that ACT cannot prove the necessary knowledge on the part of Sylvan.

ACT directs our attention to several parts of the record to support its position that the question of Sylvan's knowledge of the MOU and the Interim Agreement should be decided by a jury.[3] First, ACT points out that Sylvan's chief financial

_____

[3]ACT also contends that Sylvan did not move for summary judgment on the basis of Sylvan's lack of knowledge of the MOU and the Interim Agreement. But Sylvan did note the existence of the MOU and the Interim Agreement in its memorandum in support of its motion for summary judgment. It is true that Sylvan focused primarily on the Proposed Letter Agreement, but then so did ACT's complaint. We conclude that ACT was sufficiently on notice that it should defend the summary judgment motion on all five elements of tortious interference with contract and address the knowledge question as to all the purported agreements on which it was basing its claim. In any event, this Court has indicated that we may

officer testified that he knew that ACT and NASD had a business relationship. The witness's undisputed testimony, however, was that he was unaware that ACT was making a competing bid for a long-term contract with NASD and that he did not know of any relationship between NASD and ACT until NASD had told Sylvan that it could submit a bid for the CBT business. As ACT notes, Sylvan's co-CEO also was asked at his deposition if he knew "that NASD had some sort of a business relation with ACT." Deposition of R.Christopher Hoehn-Saric at 332 (May 13, 1999). He answered that he was aware NASD and ACT had done some co-marketing and in a later deposition said that he had seen them sharing space at trade shows, but he said he was not familiar with the specifics of the relationship. There also is some evidence that Sylvan employees who were involved in the NASD bid became aware that ACT and NASD were sharing some CBT centers. But they were told about that only after Sylvan and NASD were well into discussions on a long-term agreement between them and only because some parts of the short-term agreements with ACT might have needed to be accommodated in any Sylvan-NASD agreement. This evidence is insufficient to prove that Sylvan was on notice that it should have investigated further to see if the long-term operating and transfer agreements it was proposing to NASD would interfere with standing short-term co-marketing agreements NASD already had with ACT.[4]

_____

affirm a summary judgment on any ground supported by the record. Ozark Heartland Elecs., Inc. v. Radio Shack, 278 F.3d 759, 763 (8th Cir. 2002).

[4]It is arguable that ACT brought the wrong cause of action on the MOU and the Interim Agreement. Both of these agreements were non-exclusive, short-term agreements, intended to be temporary. Neither involved the transfer of the CBT centers from NASD to ACT—unlike Sylvan's ultimate agreements with NASD, the transactions which allegedly interfered with ACT's purported contracts with NASD. It is true that NASD, after failing to reach a long-term agreement with ACT, compensated ACT and agreed to other terms and conditions to resolve differences that arose upon termination of the MOU and the Interim Agreement. But it appears that ACT's recovery of expenses was contemplated by the terms of the agreements because the agreements were terminable at will. Under Iowa law, "contracts

ACT further points out that Sylvan became aware that ACT was making a competing bid for the operation and eventual acquisition of NASD's CBT centers at the same time Sylvan itself was preparing a bid. ACT's evidence does show that Sylvan knew, as it was preparing its proposal, that NASD was in discussions with ACT to reach a similar agreement and that NASD staff were making recommendations in support of ACT's proposal. Evidence that Sylvan knew ACT was in discussions with NASD on a long-term contract is not equivalent, however, to evidence that would have put Sylvan on notice that ACT already had interim agreements with NASD.

We conclude that the evidence in the summary judgment record of Sylvan's knowledge of the MOU and the Interim Agreement, even viewed in the light most favorable to ACT's position, is insufficient as a matter of law to create a jury question on an essential element of ACT's claim: was Sylvan on notice that it should investigate whether ACT already had contracts that would be breached if Sylvan successfully closed a deal with NASD to operate and eventually acquire NASD's CBT centers? Summary judgment on ACT's claim for tortious interference with the MOU and the Interim Agreement is affirmed.

B.

_____

terminable at will are more properly protected as a prospective business advantage rather than as a contract. Consequently the higher standard of proof requiring substantial evidence that the defendant's predominant or sole motive was to damage the plaintiff was required." Compiano v. Hawkeye Bank & Trust of Des Moines, 588 N.W.2d 462, 464 (Iowa 1999) (citation omitted); see also infra pt. III (discussing Iowa cause of action for tortious interference with prospective business advantage). We also note, as to the damages element of ACT's cause of action, that the record does not reflect that ACT sought to prove and recover damages based on the termination of these short-term agreements. With the decision we reach today, however, it is unnecessary for us to address either of these issues.

As for the Proposed Letter Agreement, Sylvan's knowledge of it is immaterial because ACT's evidence is insufficient as a matter of law to prove that the letter was indeed a contract.  "[I]f there is no contract, there can be no interference."  Tredrea v. Anesthesia & Analgesia, P.C., 584 N.W.2d 276, 287 (Iowa 1998).

The purported agreement opened with these sentences:

Pursuant to our recent meetings and conversations, this letter sets forth terms to which [ACT] is prepared to agree with respect to ACT's providing technology-based assessment services to [NASD].  *If the NASD agrees to these terms*, please sign one of the copies of this letter and return it to me for ACT's files.

Proposed Letter Agreement at 1 (emphasis added).  Included in the TERMS section of the letter was this recitation:

1.  *Subject to approval* of the terms reflected in this letter by NASD's Board of Directors at its January 1996 meeting, the parties will enter into an agreement . . . in January 1996 that implements this letter agreement and supplements the basic terms provided for herein.

Id. (emphasis added).

No NASD representative signed the agreement on behalf of the organization, and the NASD board never approved it.  Notwithstanding this undisputed evidence, ACT argues there is a genuine issue of material fact on whether there was a contract.  According to ACT, there was a meeting of the minds between NASD and ACT as a result of discussions that preceded the drafting of the proposed letter agreement, with ACT believing it was the only entity contending for the sort of long-term operation and asset-transfer agreement that its proposal contemplated.  Nevertheless, when NASD did tell ACT that it would be considering a proposal from Sylvan, ACT's president did not cry "breach" but instead went to work on a counterproposal, stating

-8-

in a memorandum to two of his employees, "Jim [O'Donnell, NASD executive vice-president] indicated that he continues to favor ACT but that he must entertain the Sylvan proposal. Even so, I don't believe that we can or should underestimate the potential of a reversal in NASD's position." Memo. from Dick Ferguson to Joe Pugh and Ricki Saylor (Dec. 22, 1995) at 1, ¶ 7. Ferguson also wrote, "I believe that ACT is still the 'favored' partner for NASD, but, *until we have a written commitment*, we can't be certain that the relationship as laid out in recent weeks will proceed." Id. at 2 (emphasis added). These are not the words of someone who believes he has cinched a deal. Notwithstanding his deposition testimony that he thought an "agreement" had been reached, his contemporaneous writing clearly demonstrates that ACT's president did not believe the parties had a legally binding contract. In any event, on its face the letter acknowledges that the terms therein are those to which ACT—not NASD—was prepared to agree. The use of the conjunction "if" in the opening paragraph of the letter demonstrates that NASD's agreement with those terms was not a foregone conclusion, at least not in the mind of ACT's president, who sent NASD the Proposed Letter Agreement on behalf of ACT. And, as we have said, no NASD representative ever manifested agreement with the terms that ACT was proposing because no NASD representative ever signed a copy of the letter. See Magnusson Agency v. Pub. Entity Nat'l Co.–Midwest, 560 N.W.2d 20, 26 (Iowa 1997) ("All contracts must contain mutual assent.").

ACT contends that proof of the existence of a contract can be found in the "extensive evidence demonstrating that ACT and NASD . . . had begun implementing" the purported agreement. Br. of Appellant at 26. While we think ACT's characterization of the evidence is hyperbolic, there is evidence in the record that both ACT and NASD had made staff assignments to effectuate the transfer; that NASD employees were told they would soon be working for ACT; and that employees from NASD had meetings and video conferences to discuss the transfer. This is not, however, as ACT suggests, evidence of performance that would prove the formation of the contract. Instead, it is evidence that employees were taking

preliminary steps to plan for the logistics of the transfer if and when the agreement actually was finalized. As the president of ACT wrote in the December 22 internal memorandum, it had been his position "all along" that "no hiring should occur until we have a written agreement in hand" and no third-party contracts involving implementation of the agreement as negotiated to date should be entered into "until we have a signed agreement in hand." Memo. from Dick Ferguson to Joe Pugh and Ricki Saylor (Dec. 22, 1995) at 2. By his own words, ACT's president admitted his belief that the unsigned letter agreement was not an enforceable contract.

Further, it is undisputed that the NASD board of directors never approved the terms of the letter as required by the language of the letter itself, and so the follow-up January 1996 agreement that ACT proposed would implement and supplement the Proposed Letter Agreement never happened. Notwithstanding the clear language in the letter, ACT questions whether board approval was really necessary. By ACT's reckoning, its president's December 22 memorandum supports its statement that "NASD informed ACT that it was not certain that board approval was even required." Br. of Appellant at 27. Whatever NASD's vice-president may have said on the matter in a telephone conversation with ACT's president is irrelevant here because the Proposed Letter Agreement—by its own terms—indicated that the final implementing and supplementing agreement would be negotiated only after the NASD board approved the Proposed Letter Agreement. ACT also suggests that its "personnel understood that the board's approval was essentially a 'formality.'" Br. of Appellant at 27. Be that as it may, the Proposed Letter Agreement—drafted by ACT—required such approval, however much a foregone conclusion the ACT employees may have thought it was. The testimony of everyone involved in the negotiations was to the same effect: NASD board approval, however nominal, was required, and it was not forthcoming.

Citing a case from a California state court, ACT argues that NASD board approval was a condition precedent to performance of the contract but not to contract

formation. Under Iowa law, "[c]onditions precedent are those facts and events, occurring subsequent to the making of a *valid contract*, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, and before the usual judicial remedies are available." Employee Benefits Plus, Inc. v. Des Moines Gen. Hosp., 535 N.W.2d 149, 154 (Iowa Ct. App. 1995) (emphasis added). Here, of course, NASD did not execute the agreement, so there was no "valid contract." In any event, the plain language of the agreement belies ACT's claim that NASD board approval was a condition precedent: it is the final agreement, that is, the future formation of a contract to implement the Proposed Letter Agreement, that hinged upon NASD board approval of the Proposed Letter Agreement. As ACT itself notes, the letter "provided that the parties would enter into a **further** agreement that **implemented** the parties' agreement if the NASD board approved the terms" of the Proposed Letter Agreement. Br. of Appellant at 29. There was no board approval and consequently there was never either an "agreement" or a "further agreement." In short, there was no contract to perform, with or without conditions.

We hold that ACT cannot prove, on this record, that the Proposed Letter Agreement was a contract. That writing therefore cannot be the basis of ACT's cause of action against Sylvan for tortious interference with contract. The District Court properly granted summary judgment to Sylvan on ACT's claim under Iowa law for tortious interference with the Proposed Letter Agreement.

III.

ACT contends that the District Court erred in granting summary judgment to Sylvan on ACT's claim that Sylvan tortiously interfered with ACT's prospective business relationship with NASD. The District Court held that ACT was unable to demonstrate any genuine issue of material fact on whether Sylvan, in submitting its bid to NASD, intentionally and improperly interfered with ACT's relationship with

-11-

NASD.  See Tredrea, 584 N.W.2d at 283-84 (listing and explaining the elements of a claim of tortious interference with a prospective business contract).  That is, the court concluded that ACT cannot prove, on this record, that Sylvan acted with the "sole or predominant purpose . . . to financially injure or destroy" ACT, substantial proof of which was required for ACT to sustain its claim.  Id. at 283 (citations to quoted cases omitted).  "In a competitive business setting, this rule of strict proof operates 'to avoid opening the door to virtually limitless suits of a highly speculative and remote nature.'"  Id. at 287 (citations to quoted cases omitted).

Because we are reviewing a decision granting summary judgment to Sylvan, ACT is entitled to the benefit of all reasonable inferences that may be drawn from the evidence.  It is not entitled, however, to the benefit of unreasonable inferences, those that amount to nothing more than mere conjecture.  See Mathes v. Furniture Brands Int'l, Inc., 266 F.3d 884, 885-86 (8th Cir. 2001).  After de novo review of the summary judgment record, we conclude that ACT does not have substantial proof that Sylvan's proposal to NASD was made solely or predominantly to financially injure or destroy ACT.

In support of its argument that factual issues remain that should be decided by a jury, ACT relies primarily on a document to which the District Court gave short shrift in reaching its decision.  ACT quotes for us "explicit admissions" from what it calls "Sylvan's own documents":

> Sylvan was compelled to intervene [in the NASD/ACT contract] for two reasons.  For one, Sylvan naturally loathes the prospect of competition in CBT delivery from any corner.  Second [the Educational Testing Service ("ETS")] loathes the prospect of its arch-rival ACT in control of a testing network.  ETS is Sylvan's most influential customer in the academic market and numbers among its top three customers across all markets.  When ETS is unhappy, Sylvan too is unhappy.
>
> ***

> . . . Sylvan was willing to accept [the] unfavorable terms [of the NASD
> deal] to keep out the competition and appease ETS.

And:

> Sylvan gave NASD a sweetheart deal to gain control of its sites, just to
> keep ACT out of the CBT market.

Br. of Appellant at 34, 35 (quoting M. Ford, <u>Sylvan Prometric:  An Account of its Business Lines</u>, vol. I (Aug. 1997) (draft) at 27-28; M. Ford, <u>Sylvan Prometric:  An Analysis of its Competitive Position</u>, vol. II (Aug. 1997) (draft) at 37 (alterations by ACT)).  In its main brief, ACT neglects to explain the genesis of these statements.  In fact, the quoted language is from drafts of documents prepared by Michelle Ford, a graduate student in business whom Sylvan hired as a summer intern in 1997 for the purpose of preparing background reports on computer-based testing.  Ford had no experience in computer-based testing and little knowledge of the business when she went to work for Sylvan.  It is undisputed that neither Ford nor Nicholas Kouwenhoven, the Sylvan employee who was Ford's supervisor for the summer, had personal knowledge of Sylvan's decision to bid for the NASD business or the mechanics of preparing that bid.  The same is true of every Sylvan employee Ford interviewed in preparing the reports.  Indeed, Ford agreed that the language in the reports suggesting that Sylvan did not like competition in the CBT market was her own and that she did not discuss her speculation with any other Sylvan employee.  Deposition of Michelle Ford at 228 (Jan. 14, 1999).

After considering the background of these documents (but without going so far as to declare them inadmissible), the District Court in reaching its decision gave "little, if any weight" to the statements cited by ACT.  Order of Dec. 30, 1999, at 19.  ACT charges that this demonstrates that the court improperly weighed the evidence and made credibility determinations.  We disagree.  Putting aside the questionable admissibility of these documents, we conclude that the statements taken from the

reports are not evidence, much less substantial evidence, that Sylvan acted with the predominant purpose to financially injure or destroy ACT. They are not admissions of a Sylvan agent but merely the conjecture of a summer intern who lacked any personal knowledge of Sylvan's motivations in submitting its proposal to NASD a year and a half before and who did not even interview any Sylvan employees who might have had such knowledge. This speculation by a temporary employee is not, as a matter of law, substantial proof that Sylvan's primary purpose in pitching a deal to NASD was to financially injure or destroy ACT.

Even so, according to ACT, it came forward with sufficient evidence to create a genuine issue on whether Sylvan's business justifications for wanting to do a deal with NASD were pretextual, so summary judgment was improper. Sylvan's co-CEO testified that the company had four reasons for submitting its proposal, as written, to NASD: NASD's test volume would help fill Sylvan's excess testing capacity; NASD was a prestigious and desirable business partner; NASD made it clear it was seeking to get its CBT centers off its books, and that is why the asset transfer was included in Sylvan's proposal even though Sylvan did not have need for some of the testing centers; and NASD had CBT centers in areas where Sylvan could use additional testing capacity. ACT attempts to construe the record so as to show a genuine issue on whether the claimed business purposes are legitimate. But the supposed evidence to which ACT points requires us to draw inference upon inference in order to conclude there might be a material fact issue lurking somewhere. We decline to do so, as did the District Court.

ACT argues that the necessary evidence of pretext is found in Sylvan's admitted goal of underbidding ACT on the NASD contract in order "to blow the doors off" ACT's pending proposal, and doing so at financial risk to itself. Deposition of Derek W. Linden at 43 ("[T]he one line I recall from the meeting is Doug Becker [Sylvan's co-CEO] saying that they would submit a proposal to us that would blow the doors off any other proposal we may have received."). Again, we

seriously question the soundness of the inferences that we must draw from the evidence in order to agree with ACT's assessment. See Nat'l Parcel Servs., Inc. v. J.B. Hunt Logistics, Inc., 150 F.3d 970, 971 (8th Cir. 1998) ("[T]he passing remark by [defendant] that it could 'take you out' is not the kind of competitive threat that will support a prima facie case of tortious interference.") (applying Iowa law in case where defendant cut prices so low it lost money). Making a bid below cost is not, on its face, a bad business move, particularly when Sylvan had numerous other customers who were paying cost-plus. Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 (1986) ("[C]utting prices in order to increase business often is the very essence of competition. Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect.") (predatory pricing case under federal antitrust law). Likewise, as Sylvan acknowledged to NASD from the beginning, some of the test centers were expected to be (and in fact were) closed after Sylvan acquired them. As Sylvan explained, however, with no contrary evidence from ACT, NASD had made it clear that it wanted the CBT centers off its books and that an offer for the centers was a necessary part of doing a deal. Duplicative centers indeed were closed, but it is undisputed that NASD centers remained open in those locations where the extra capacity was needed.

It may well be, as ACT argues, that "Sylvan did not want ACT to acquire the NASD test business and test centers and thereby become a competitor." Reply Br. of Appellant at 17; see also Br. of Appellant at 34 ("Substantial evidence demonstrates that Sylvan was motivated by a desire to ensure that ACT did not acquire the NASD centers and thereby became [sic] a competitor."). If ACT had won NASD's business, Sylvan could not. Keeping one step ahead of the competition—whoever it might be—was in Sylvan's self-interest as a for-profit business and does not automatically translate into a motive to injure or destroy the competitor. See Fin. Mktg. Servs., Inc. v. Hawkeye Bank & Trust of Des Moines, 588 N.W.2d 450, 459 (Iowa 1999) (noting "nothing improper" where a bank was acting to improve its own financial position).

ACT cannot show there is a genuine issue of material fact on the intent element of its claim simply by presenting evidence that Sylvan preferred to avoid competing with ACT in offering CBT services. Legitimate business practice should not be converted by the courts into an intentional tort. Moreover, we see no evidence to support ACT's intentional tort claim in this record, where evidence of a motivation to acquire the NASD CBT centers before ACT acquired them is the evidence ACT claims to be substantial proof that Sylvan's declared business reasons for doing the deal were pretext for its true goal—to financially destroy or injure ACT. Even giving ACT the benefit of all the reasonable inferences that may be drawn from the evidence, those inferences do not, even in the aggregate and without considering Sylvan's evidence to the contrary, amount to substantial proof that Sylvan was motivated to do anything other than to win the contract for NASD's business and CBT network, which would result in ACT losing the deal. "Any harm to [ACT] was merely incidental to the accomplishment of [Sylvan's] primary goal": to close the deal with NASD. Id. at 460. As a matter of law, ACT cannot show, on the record before the Court, that Sylvan's purpose in making its proposal to NASD was to financially injure or destroy ACT—much less that such was Sylvan's primary purpose. ACT therefore cannot prove an essential element of its claim.

Viewing the undisputed facts in this record in the light most favorable to ACT, we hold that summary judgment on ACT's claim against Sylvan for tortious interference with prospective contractual relations was properly granted to Sylvan.

IV.

ACT also appeals the decision of the District Court granting the part of Sylvan's motion in limine that challenged the admissibility of evidence of ACT's claimed antitrust damages. The court concluded that ACT could not prove its alleged damages flowed from monopolistic actions illegal under § 2 of the Sherman Act, and so ACT would not be permitted to present evidence of such damages.

-16-

Ordinarily, we review a district court's ruling on a motion in limine for abuse of that court's discretion. See, e.g., Glastetter v. Novartis Pharms. Corp., 252 F.3d 986, 989 (8th Cir. 2001) (reviewing decision to exclude expert testimony for abuse of discretion, notwithstanding that the decision resulted in summary judgment for the defendant); Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1081 (8th Cir. 1999) (same). Not until its reply brief did ACT suggest that the standard should be otherwise, contending that the court's "exclusion order was based on a pure error of law" and we should therefore review it de novo. Reply Brief at 19 (citing United States v. Johansen, 93 F.3d 459, 468 (8th Cir. 1996)). It is unnecessary for us to decide if ACT properly raised the issue or to determine the appropriate standard, however, because we already have conducted a de novo review of the underlying question: is Sylvan entitled to judgment as a matter of law on the question of whether Sylvan's business justifications for doing the deal with NASD, the conduct claimed by ACT to be in violation of antitrust laws, were pretextual? We have concluded that the answer to that question is "yes." See supra pt. III.

ACT has referred in its brief to Sylvan's large market share in computer-based testing and to Sylvan's acquisition of its potential competitors but has claimed antitrust damages, in the form of lost profits, only from the transaction between Sylvan and NASD. "Liability turns, then, on whether 'valid business reasons' can explain [Sylvan's] actions" in its business dealings with NASD. Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 483 (1992).

As we have explained, ACT cannot prove on this record that Sylvan's four business justifications for structuring the transaction with NASD as it did were not legitimate. See supra 14-16. First, it is undisputed that Sylvan's testing capacity was significantly underutilized in some areas and that NASD clients would fill some of the excess capacity. Second, the desirability of partnering with an organization of NASD's prestige is unquestioned. Third, it is also without dispute that Sylvan knew it would have to acquire NASD's CBT network, including some centers that would

be redundant to Sylvan's own centers, because NASD made it clear that it wanted those facilities off its books. And finally, it is uncontroverted that some of the gaps in Sylvan's own testing network were closed by the acquisition of NASD's centers. Sylvan's pursuit of an agreement with NASD cannot be characterized as "conduct [that] makes sense only because it eliminates competition." Trace X Chem., Inc. v. Canadian Indus., Ltd., 738 F.2d 261, 266 (8th Cir. 1984), cert. denied, 469 U.S. 1160 (1985). ACT's evidence does not create a triable jury question on whether Sylvan's proffered business reasons for doing the deal were legitimate, and "[w]hen a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a section 2 violation." Midwest Radio Co. v. Forum Publ'g Co., 942 F.2d 1294, 1297-98 (8th Cir. 1991) (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985)). In these circumstances, it was correct for the District Court to grant Sylvan's motion in limine, as the damages ACT claims from its failure to close a deal with NASD did not flow from conduct by Sylvan that violated § 2. See Amerinet Inc. v. Xerox Corp., 972 F.2d 1483, 1494 (8th Cir. 1992) ("If a plaintiff has suffered financial loss from the *lawful* activities of a competitor, then no damages may be recovered under the antitrust laws.") (citation to quoted case omitted)), cert. denied, 506 U.S. 1080 (1993).

V.

Relying on the District Court's decision granting the motion in limine, Sylvan renewed its motion for summary judgment on ACT's claims that Sylvan was liable under § 2 of the Sherman Act. The court granted the motion and ACT appeals.[5]

---

[5]The court initially denied Sylvan's renewed motion for summary judgment, noting that ACT had sought not only damages but also injunctive relief and that ACT might be entitled to the equitable relief. The court certified its order granting Sylvan's motion in limine for interlocutory appeal; this Court denied leave to file such an appeal. ACT then dismissed its claim for injunctive relief so that the court would resolve the summary judgment question.

"Antitrust injury, causation, and damages all are necessary parts of the proof" of liability under § 2 of the Sherman Act. Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir.), cert. denied, 531 U.S. 979 (2000). As we have explained, any evidence ACT may have of damages it incurred as a result of Sylvan's deal with NASD was properly excluded from the summary judgment record because the alleged damages were not caused by unlawful acts of Sylvan. ACT therefore is unable to prove either causation or antitrust injury. It follows that summary judgment was properly granted to Sylvan on ACT's claim of a § 2 violation.

## VI.

In case number 01-3583, ACT appeals from the order of the District Court denying ACT's motion for review of taxation of costs. ACT moved to dispense with briefing on the issue, so we do not know if ACT has a quarrel with the amount of costs awarded or is challenging the court's authority to award costs as it did. As to the amount of costs, "[a] court of appeals lacks jurisdiction to hear an appeal where the sole issue is that the district court abused its discretion as to the amount of costs awarded." Poe v. John Deere Co., 695 F.2d 1103, 1109 (1982). And to the extent ACT is challenging whether the award was necessary and otherwise proper, we see no abuse of discretion. Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 347 (8th Cir. 1995) (standard of review).

## VII.

The judgments of the District Court are affirmed in all respects.

RICHARD S. ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I agree that summary judgment was properly entered for defendant on the claim for tortious interference with contract, and I therefore join parts I and II of the Court's opinion.

I also join part VI of the Court's opinion, having to do with taxation of costs.

As to the claim for tortious interference with a prospective business relationship, however, I respectfully dissent. In my view, when this record is considered in the light most favorable to ACT, as it must be on this appeal, there is a genuine issue of material fact as to Sylvan's motivation. Questions of motive are particularly delicate, and summary judgment should be used more sparingly on such questions than on most others. The memorandum prepared by Michelle Ford, which the Court does not hold inadmissible, is sufficient evidence to support ACT's position at this preliminary stage of the case. Ms. Ford was instructed to prepare a document describing the history of Sylvan's dealings with NASD. She did what she was told to do. That she was a summer intern, had little knowledge of the business, and had no experience in computer-based testing, ante at 13, are considerations going to the weight of her evidence, not its admissibility. Certainly there is evidence to the contrary, and a jury could have chosen to disregard Ms. Ford's conclusions. Indeed, one may go so far as to say, if one wishes, that ACT would probably lose this case, were it tried to a jury. But that is not the standard we are to apply at this juncture. I cannot say it would have been irrational, when all of this record, including Ms. Ford's memorandum, is considered, for a jury to find that Sylvan was predominantly motivated by a desire to injure ACT. Among other things, the deal made with NASD was below Sylvan's cost, certainly a potent fact. The directed-verdict standard, or, as we have learned to say, the standard on motions for judgment as a matter of law, is the same as the standard to be applied on motions for summary judgment. This case should have gone to trial on the issue of motivation.

For many of the same reasons, I also dissent from the Court's affirmance of summary judgment for the defendant on the claim under § 2 of the Sherman Act. Again, Sylvan puts forward plausible business justifications, but there is evidence to the contrary, and a jury could rationally decide in favor of ACT on this issue.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.